70 A.3d 347

**William J. WARR, Jr., et al.**

v.

**JMGM GROUP, LLC, d/b/a/ Dogfish Head Alehouse.**

**No. 57, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 25, 2013.

John Vail (Center for Constitutional Litigation, P.C., Washington DC; Andrew E. Bederman and Jason W. Fernandez of Greenberg & Bederman, LLP, Silver Spring, MD), on brief, for appellants.

Robert B. Hetherington (Amy Leete Leone of McCarthy Wilson, LLP, Rockville, MD), on brief, for appellee.

Michael J. Winkelman, Esq., McCarthy, Winkelman & Marrow, Bowie, MD, Matthew W. Tievsky, Esq., Chaikin, Sherman, Cammarata, Siegel, P.C., Washington, DC, James M. Nichols, Esq., Warnken, LLC, Towson, MD, for amicus curiae brief of the Maryland Association for Justice on Behalf of the Petitioner.

Steven J. Kelly, Esq., Silverman, Thompson, Slutkin & White, LLC, Baltimore, MD, for amicus curiae brief of Mothers Against Drunk Driving.

J. Steven Wise, Esq., Joseph A. Schwartz, III, Esq., Schwartz, Metz & Wise, P.A., Annapolis, MD, for amici curiae brief of The Maryland State Licensed Beverage Association, Inc. and The Restaurant Association of Maryland, Inc., in Support of Respondent.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

This case presents us with the opportunity to consider once again whether or not this Court should recognize dram shop liability.[1]

William J. Warr, Jr. and Angela T. Warr filed suit in the Circuit Court for Montgomery County against JMGM Group,[2]

---

* Bell, C.J., participated in the hearing of the case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

1. The term "dram shop liability" refers to "[c]ivil liability of a commercial seller of alcoholic beverages for personal injury caused by an intoxicated customer." Black's Law Dictionary 568 (9th ed.2009). "Dram shop" is an archaic term for a bar or tavern. Black's Law Dictionary 567. The term "dram" is an antiquated unit of fluid measurement, equivalent to one eighth of a liquid ounce, used by apothecaries; its use in the phrase "dram shop" was a result of the fact that taverns often sold hard alcohol by the dram.

2. The acronym JMGM is undefined in the record.

LLC, which owns the Dogfish Head Alehouse (Dogfish Head), to recover for injuries they and their daughter Cortavia M. Harris sustained and for the death of their second daughter, Jazimen, in a car accident. The Warrs alleged that Michael Eaton,[3] the driver of the vehicle that struck the car Mr. Warr was driving, had been served alcohol while Mr. Eaton was "clearly intoxicated" at Dogfish Head. Because members of the Dogfish Head's staff had served Mr. Eaton alcohol while he was so compromised, the Warrs alleged, the tavern had breached its duty to them to "not furnish alcohol to intoxicated persons," which caused their injuries.[4]

Judge Eric M. Johnson of the Circuit Court for Montgomery County denied Dogfish Head's motion to dismiss. In granting, however, Dogfish Head's motion for summary judgment, Judge Johnson opined that he was bound by our decisions in *State v. Hatfield*, 197 Md. 249, 78 A.2d 754 (1951) and *Felder v. Butler*, 292 Md. 174, 438 A.2d 494 (1981) in which dram shop liability was not recognized as a cause of action in Maryland. The Warrs appealed Judge Johnson's decision but, before any proceedings in the Court of Special Appeals, we granted the Warrs' petition for certiorari, 427 Md. 606, 50 A.3d 606 (2012), to consider whether this Court should recognize dram shop liability.

The undisputed facts that give rise to our consideration of dram shop liability in this case were set forth by Judge Johnson in his opinion granting Dogfish Head's motion for summary judgment and reflect that on August 21, 2008, Michael Eaton was a customer at Dogfish Head Alehouse, which is located in Gaithersburg, Montgomery County. Mr. Eaton began drinking beer and liquor at 5:00 pm, allegedly ordering fourteen bottles of beer and two drinks of hard liquor and drinking at least one other drink that was purchased for

---

3. Mr. Eaton is not a party to this suit.

4. In considering the issues in this case, we express no opinion regarding any effect of sales of alcohol by tavern owners on premises liability.

him.[5]   Mr. Eaton stopped drinking at about 10:00 pm that evening and left, but returned to the Dogfish Head about forty-five minutes later and allegedly ordered three more bottles of beer and a shot of tequila.[6]   After being served the tequila, Mr. Eaton was informed by his server that he was not going to be served any more alcohol.   Judge Johnson also noted that, "[a]n employee of the Dogfish offered to call a cab for this patron who they had cut off from alcoholic beverages.   He refused."   The complaint alleges that after Mr. Eaton left Dogfish Head in his vehicle, he was involved in the accident on Interstate 270 that forms the basis of the instant action.

In their complaint, the Warrs asserted five causes of action, all related to negligence.   In each count, the theory of liability was that Dogfish Head had a duty to refuse to provide alcoholic beverages to an individual who was either visibly intoxicated or who was considered a "habitual drunkard." The Warrs asserted that the employees of Dogfish Head knew that Mr. Eaton was a "habitual drunkard" and that they knew, or should have known, that he was visibly intoxicated and still served him alcohol, which was the proximate cause, according to the Warrs, of the collision:

10.   At all times material, [Dogfish Head] and its agents, servants and employees had a legal duty to not furnish alcohol to intoxicated persons and to not furnish alcohol to a habitual drunkard.

11.   Notwithstanding this duty, and in breach thereof, [Dogfish Head's] agents, servants and employees negligently furnished alcohol to Michael Eaton, a clearly intoxicated individual who was also known as a habitual drunkard.   [Dogfish Head] is vicariously liable for

---

5.   The hearing judge's opinion is unclear as to the exact type of hard alcohol consumed by Mr. Eaton.

6.   Mr. Eaton allegedly also consumed a "lemon drop shot," which is a drink consisting of vodka, lemon juice, and sugar, at some point during the evening;  the hearing judge's opinion does not reflect whether it was during Mr. Eaton's first or second time at the Dogfish Head.

negligence of its agents, servants, and employees and [the Warrs'] resulting injuries and damages.

12. As a direct and proximate result of this breach of duty by [Dogfish Head], and its agents, servants and employees, Mr. Eaton operated his vehicle under the influence of alcohol. During the operation of his vehicle, Michael Eaton struck the rear of the Warr vehicle, causing Jazimen L. Warr to suffer fatal bodily injuries, to experience conscious pain and suffering and to suffer other damages. The Estate of Jazimen L. Warr also incurred medical expenses and burial and funeral expenses.

Dogfish Head filed a motion to dismiss, under Maryland Rule 2–322(b)(2),[7] for failure to state grounds upon which relief could have been granted, in which it asserted that dram shop liability was not recognized in Maryland. Judge Johnson denied the motion, stating that, although in our decisions in *Hatfield* and *Felder*, as well as the Court of Special Appeals' decision in *Wright v. Sue & Charles, Inc.*, 131 Md.App. 466, 749 A.2d 241 (2000), did not recognize a cause of action against a provider of alcoholic beverages under a theory of dram shop liability, "[o]ral arguments convinced this Court that the factual underpinnings of this case make a change in Maryland's jurisprudence with respect to Dram Shop Liability ripe to the core." Judge Johnson concluded that dismissal was not warranted, stating that:

[t]he dram shop laws and the rationale in support of them should be as the Court said in *Felder* ... 'a vestige of the past no longer suitable for the circumstances of our people....' *Felder v. Butler*, 292 Md. 174, 182–83 [438 A.2d 494]. Maryland Courts have not hesitated to adopt a new cause of action by judicial decision when they have concluded that course was compelled by changing circumstances.

---

7. Rule 2–322 states, in pertinent part:

(b) **Permissive.** The following defenses may be made by motion to dismiss filed before the answer, if an answer is required ... (2) failure to state a claim upon which relief can be granted.

For the reasons set for herein and reflected in the attached Order, Defendant's Motion to Dismiss is denied.

Dogfish Head, thereafter, filed a motion for summary judgment, asserting that Maryland did not recognize dram shop liability and that the facts did not warrant a change. Judge Johnson granted Dogfish Head's motion for summary judgment and issued an opinion that deviated from his earlier denial of Dogfish Head's motion to dismiss, based upon his view that the Circuit Court was not the appropriate judicial actor to make a "radical change" in the common law:

> The facts of this case undoubtedly could serve as the impetus to adjusting Maryland jurisprudence on the topic of dram shop liability. This Court, however, is not the proper Court to make such a radical change in Maryland jurisprudence. The decision to overturn stare decisis is the province of the Maryland Court of Appeals. Consequently, this Court is bound by stare decisis and must grant the Defendant summary judgment. The Court is of the opinion that while the Maryland Legislature has not enacted dram shop liability legislation, it has not expressly prohibited it. The Court of Appeals, thus, is in a unique position where it can harmonize our jurisprudence with current societal conditions without being in conflict with the Maryland Legislature. The Maryland Court of Appeals has not hesitated to adopt a new cause of action by judicial decision when it had concluded that course was compelled by changing circumstances. This Court is of the opinion that the same holds true for dram shop liability. For the reasons set forth herein and reflected in the attached Order, Defendant's Motion for Summary Judgment is granted.

The Warrs appealed this decision, but, before any consideration in our intermediate appellate court, we granted their petition for certiorari to consider, once again, whether we should adopt dram shop liability. We shall decline to impose dram shop liability on Dogfish Head in the absence of any duty owed by the tavern to the Warrs.

In considering the question, we do not write on a blank slate.[8] We first considered whether to adopt dram shop liability in *State v. Hatfield*, 197 Md. 249, 78 A.2d 754 (1951), in which the widow of James Joyce sought damages for her husband's death in a car accident, caused by a minor who had been served alcohol by Hatfield and then assumed the wheel of a car. The trial court sustained Hatfield's demurrer[9] on the ground that providing alcohol was not a proximate cause of the accident. We affirmed but limited our analysis, however, to the issue of proximate cause:

[a]part from statute, the common law knows no right of action against a seller of intoxicating liquors, as such, for 'causing' intoxication of the person whose negligent or wilful wrong has caused injury. Human beings, drunk or sober, are responsible for their own torts. The law (apart from statute) recognizes no relation of proximate cause between a sale of liquor and a tort committed by a buyer who has drunk the liquor.

*Hatfield*, 197 Md. at 254, 78 A.2d at 756. We declined to adopt dram shop liability, noting that it was for the legislative branch, not the judiciary, to consider:

In the course of the last hundred years there probably has seldom, if ever, (except during prohibition) been a regular session of the General Assembly at which no liquor laws were passed. On few subjects are legislators kept better informed of legislation in other states. In the face of the flood of civil damage laws enacted, amended and repealed in other states and the Volstead Act—and the total

---

**8.** The phrase "blank slate" is a translation of the Latin phrase *tablua rasa*, a term popularized by John Locke in An Essay Concerning Human Understanding (1690), to refer the natural state of the human mind as being blank and capable of being imprinted upon, or learning, based on experience.

**9.** Although no longer a commonly used term, demurrer referred to "[a] pleading stating that although the facts alleged in the complaint may be true, they are insufficient for the plaintiff to state a claim for relief and for the defendant to frame an answer." Black's Law Dictionary 498 (9th ed.2009). Functionally, motions under Rule 2–322(b)(2) have replaced demurrers.

absence of authority for such liability, apart from statute— the fact that there is now no such law in Maryland express- es the legislative intent as clearly and compellingly as affirmative legislation would.

*Id.* at 256, 78 A.2d at 757.

Three decades after our decision in *Hatfield*, we again were asked to adopt dram shop liability in *Felder v. Butler*, 292 Md. 174, 438 A.2d 494 (1981). In that case, Kenneth Felder sued Spearman Butler for injuries relating to a car accident involv- ing Madeline Hawkins who, Felder alleged, was intoxicated as a result of Butler's sale of alcohol. The Circuit Court for Charles County sustained Butler's demurrer on the ground that *Hatfield* settled the matter.

In seeking a reversal of *Hatfield*, Felder argued before us that the legal landscape had changed significantly in the intervening thirty years and that many jurisdictions had adopted dram shop liability in the interim. We noted, howev- er, that our Legislature had attached only criminal penalties to the sale of liquor to obviously intoxicated persons, Section 118(a) of Article 2B of the Annotated Code of Maryland (1957, 1976 Repl.Vol.),[10] and that states that had enacted criminal, but not civil, statutes regulating the sale of alcohol adhered to the common law rule of non-liability. *Felder*, 292 Md. at 181– 82, 438 A.2d at 498.

Felder also argued that societal changes in attitudes regard- ing alcohol consumption as well as the sharp increase in the number of states recognizing dram shop liability should have influenced our consideration of dram shop liability. In declin-

---

**10.** Section 118(a) of Article 2B of the Annotated Code of Maryland, (1957, 1976 Repl.Vol.) stated, in pertinent part:

No licensee under the provisions of this article, or any of his employ- ees, shall sell or furnish any alcoholic beverages at any time to a minor under twenty-one years of age, except that the age shall be eighteen years for beer and light wine, either for his own use or for the use of any other person or to any person who, at the time of such sale, or delivery, is visibly under the influence of any alcoholic beverage.... Any person violating any of the provisions of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall suffer the penalties provided by § 200 of this article....

ing the invitation to change the common law, we acknowledged that the Legislature regulates the dispensing and consumption of alcoholic beverages and recognized that the failure to enact dram shop liability reflected that its imposition was disfavored as a matter of public policy:

Whether Maryland should abandon the rule in *Hatfield* and align itself with the new trend of cases which impose civil liability upon vendors of alcoholic beverages for the torts of their inebriated patrons depends ultimately upon which line of authorities, all things considered, best serves the societal interest and need. That determination clearly impacts on the development of the law relating to the dispensing and consumption of alcoholic beverages, a subject long pervasively regulated by the legislature.

\* \* \*

In determining the public policy of the State, courts consider, as a primary source, statutory or constitutional provisions. Therefore, since the legislature has not yet created dram shop liability by statute, we decline, for now, to join the new trend of cases. . . .

*Id.* at 183–84, 438 A.2d at 499.

In the instant case, the Warrs adopt many of Felder's arguments and emphasize that societal shifts have been even more intense since *Felder*, because knowledge regarding the risks and consequences of drunk driving has increased substantially. They also argue that our analysis regarding proximate cause has shifted since *Felder*. Finally, they argue that nearly every other State recognizes, statutorily or at common law, some form of civil liability for vendors of alcohol who sell intoxicants to obviously intoxicated patrons. With respect to duty, the Warrs essentially argue that the Dogfish Head had a duty to protect them from injury from the acts of an evidently inebriated patron by refusing to serve that individual alcohol once he had become visibly intoxicated.

Dogfish Head responds that in *Hatfield* and *Felder* we appropriately stated that it was the role of the Legislature, not the courts, to adopt dram shop liability, in part because

alcohol consumption is such a heavily regulated field. Dogfish Head also asserts that our jurisprudence does not recognize a duty imposed upon a tavern to protect the general public from the actions of a patron, absent a special relationship that does not exist here. Finally, the tavern asserts that our jurisprudence regarding proximate cause has not expanded so far as to impose liability in the present case, because Mr. Eaton himself made the decision to drink the alcohol and to drive home.

Any theory of liability sounding in negligence is predicated on the existence of the following elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On Target, Inc.*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (internal quotation marks omitted). Vital to sustaining a cause of action in negligence is the existence of a legally recognized duty owed by the defendant to the particular plaintiff. *Id.* at 549, 727 A.2d at 949. Duty, in this regard, is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Patton v. USA Rugby Football,* 381 Md. 627, 636–37, 851 A.2d 566, 571 (2004) (internal quotations omitted).

The Warrs proffer multifaceted arguments regarding the existence of a duty sufficient to support a cause of action against Dogfish Head. They assert that this Court, in *Hatfield,* assumed that there is a duty on the part of a tavern owner to refrain from providing alcohol to an intoxicated patron when we stated, "[w]e may assume, without deciding, that on such facts the defendant would be 'guilty of an actionable wrong independently of any statute', not, however, for making the driver drunk by selling him liquor, but for placing him bodily, in a state of unconsciousness, in the sleigh and starting the horses." *Hatfield,* 197 Md. at 252, 78 A.2d at 755.

This argument, however, does not bear weight under careful scrutiny, because we were emphasizing that a tavern owner who placed an unconscious patron in a sleigh would have undertaken a duty to the injured third party by *actually placing the patron in the transport and starting it home,* were that to have occurred. We began our discussion by reviewing an Indiana case, *Dunlap v. Wagner,* 85 Ind. 529, 530 (1882), in which a tavern owner had placed an unconscious patron into a sleigh and started the horses homeward. Because the patron in that case was unconscious, however, the horses ran off-route and one of them, owned by the plaintiff, was killed. We then opined that the tavern could have been liable under Maryland law, were its agent to actually have set events in motion by starting the horses home. In so doing we were not recognizing, implicitly or otherwise, the existence of a duty owed to a third party by the tavern owner to refuse to serve an intoxicated patron.

The Warrs next assert that Dogfish Head owed them a duty to prevent the harm caused by Mr. Eaton based on general principles of negligence law. Duty, however, is not assumed, but is generally determined by examining a number of factors, to include:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986), quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976). Our analysis, unlike what the Warrs assert and the dissent embraces, supports the conclusion that Dogfish Head

did not owe a duty to the Warrs because of its provision of alcohol to Mr. Eaton.

With respect to foreseeability, the Warrs assert that the provision of alcohol to an intoxicated person *will* cause death to a third party, but this causal relationship is anything but assured. The first limitation is the inherent assumption that the third party, to whom alcohol was served, such as Mr. Eaton, will drive, which is obviously not an absolute. Indeed, in this case, Dogfish Head attempted to contact a taxi service for Mr. Eaton, but he refused. It is simply not a given that imbibing alcohol and driving are coextensive.

Even more of an obstacle is the assumption that Dogfish Head, or any entity or person who serves alcohol to another, has control over the actions of that party. Foreseeability in the context of controlling ones's own behavior is readily derived. If a person fires a gun randomly, it is a natural and foreseeable result that someone else may be harmed by the bullet, and thus the individual is under a duty to exercise reasonable care in discharging his or her weapon.

When the harm is caused by a third party, rather than the first person, as is the case here, our inquiry is not whether the harm was foreseeable, but, rather, whether the person or entity sued had control over the conduct of the third party who caused the harm by virtue of some special relationship:

> "[t]he fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured."

*Remsburg v. Montgomery*, 376 Md. 568, 583, 831 A.2d 18, 26–27 (2003), quoting *Ashburn*, 306 Md. at 628, 510 A.2d at 1083. A tavern owner who provides alcohol to an intoxicated patron does not exercise control over the conduct of the patron, in

driving or walking, for example. In the absence of control, our jurisprudence is replete with holdings that, regardless of any foreseeability, a duty does not exist to the general public, with respect to harm caused by a third party, absent the existence of a special relationship between the person sued and the injured party or the person sued and the third party.

Our most recent pronouncement in which we did *not* define a duty to the general public with respect to harm caused by a third party was *Barclay v. Briscoe,* 427 Md. 270, 47 A.3d 560 (2012). In *Barclay,* we were asked to consider whether an employer was liable to an injured motorist when an employee, who had been working for 22 hours, was involved in a car accident on his way home. The duty to the public that was asserted before us was premised on the employer being liable for "failing to prevent the risk a fatigued employee posed to the motoring public." *Id.* at 292, 47 A.3d at 573. We noted that "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." *Id.* at 294, 47 A.3d at 574–75, quoting *Ashburn,* 306 Md. at 628, 510 A.2d at 1083. We expressly stated that, " '[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not itself impose upon him a duty to take such action.' " *Id.* at 295, 47 A.3d at 575, quoting *Lamb v. Hopkins,* 303 Md. 236, 242, 492 A.2d 1297, 1300 (1985). We were explicit that there was no duty:

> "[i]n the absence of either one of the kinds of special relations described in [Section 315 of the Restatement (Second) of Torts], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself."

*Barclay,* 427 Md. at 295, 47 A.3d at 575, quoting *Lamb,* 303 Md. at 242 n. 4, 492 A.2d at 1300 n. 4.

The Warrs and the dissent attempt to sidestep our jurisprudence by arguing that it is the conduct of the tavern, *i.e.* that a risk of injury was increased, that is at issue, rather than the conduct of the third party driver who actually causes the injuries. In so doing, they assert that the tavern is liable for increasing the risk that Mr. Eaton would drive while intoxicated, a concern about which we gave short shrift in *Barclay.*

In *Barclay,* the employer increased the risk that the employee would be fatigued by scheduling him for 22 hours of consecutive work, yet we held there was no duty because the employer could not control the employee's conduct after his shift and there was no relationship between the employer and the injured person. *Barclay,* premised on decades of our jurisprudence, is indistinguishable from the instant case and recognizes that risk assessment is not the nomenclature of duty to third parties; "special relationship" is. In *Barclay,* a unanimous opinion of this Court within the last year, we explicitly rejected that which the dissent embraces: "[A]ccording to Oregon case law, including its recognition of dram shop liability, the employer would still be 'subject to the general duty to avoid conduct that unreasonably creates foreseeable risk of harm' to a third party. . . . *As explained,* supra, *this is not the law in Maryland." Barclay,* 427 Md. at 300, 47 A.3d at 578 (emphasis added) (citations omitted).[11]

---

**11.** The dissent attempts to distinguish *Barclay* by asserting that Dogfish Head "actively" created the risk that Mr. Eaton would drive home by serving him while he was "visibly intoxicated," while the employer in *Barclay* was only "passive" by permitting the employee, who worked 22 straight hours, to become exhausted and then drive home. This distinction, however, is without a difference, because in both cases no one *controlled* the behavior of the employee or Mr. Eaton—both chose whether to exhaust himself or drink and drive. Indeed, we expressly noted in *Barclay* that we were relying on *Kuykendall v. Top Notch Laminates, Inc.,* 70 Md.App. 244, 520 A.2d 1115 (1987), in addition to other cases including *Felder* and *Hatfield,* that, because there was no affirmative act of control *over whether the employee operated the motor vehicle,* there was no duty. *Barclay v. Briscoe,* 427 Md. 270, 306, 47 A.3d 560, 582 (2012) (" 'Top Notch, took no affirmative act with respect

The foundation of our jurisprudence,[12] *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), involved a police officer who encountered an intoxicated driver in a parking lot. The driver was behind the wheel of his car with the engine running, but the car was parked. The officer directed the driver to park his car in the lot and not to drive home. After the officer left, however, the driver attempted to drive home and collided with a pedestrian, who suffered serious injuries. The pedestrian sued the officer, the police department, and Anne Arundel County, alleging that the officer was negligent in failing to detain the driver. The Circuit Court granted the defendants' motion to dismiss on the issue of public official immunity, which we affirmed. We went on to state, however, that even if immunity were not applicable, liability could not attach because the officer did not owe the plaintiff a duty:

> This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured or between the actor and the person injured. "Thus, we recognize the general rule, as do most courts, that absent a "special relationship" between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers."

*Id.* at 628, 510 A.2d at 1083 (citations omitted).[13]

---

to [the employee] *operating a motor vehicle.*' " (quoting *Kuykendall,* 70 Md.App. at 251, 520 A.2d at 1118) (emphasis added)).

**12.** *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985), involving whether a probation officer who failed to report a probationer's violations owed a duty to an individual who was injured by the probationer's conduct, decided a year before *Ashburn,* was our first opinion on the issue of duty in the context of harm to a third party, but *Ashburn* has become the focus of the development of our jurisprudence.

**13.** In *Williams v. Mayor and City Council of Baltimore,* 359 Md. 101, 753 A.2d 41 (2000), in considering whether a duty of care existed from

We reaffirmed the principle that a special relationship must exist to support liability for harm caused by a third party, in the context of 911 operators, in *Muthukumarana v. Montgomery County*, 370 Md. 447, 805 A.2d 372 (2002). In *Muthukumarana*, we resolved two cases involving the issue of whether emergency dispatchers owed a duty to individuals who suffered harm after contact with 911. In the first case, a young woman was left, unconscious, in the woods by a group of her "friends," after they had been drinking. Fearing the consequences of being caught drinking underage, a member of the group called 911 to anonymously report the young woman's location. The dispatcher, however, relayed the incorrect information to patrol officers, who went to the wrong location, and did not find the young woman, who died at the location provided to the dispatcher. In the companion case, a woman who had been assaulted by her husband called 911 to report the domestic violence. While she was on the phone with the operator, her husband returned to the room in which she and her children were and killed himself and the children.

In both cases, the plaintiffs alleged that the dispatch operators owed a duty to the injured third parties. We, however, disagreed, relying on *Ashburn* for the principle that, absent a special relationship, the dispatchers did not owe a duty to the members of the general public who call for emergency assistance. *Muthukumarana*, 370 Md. at 487–88, 805 A.2d at 396 (" '[a] proper plaintiff . . . is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he relied, he may maintain his action in negligence.' " (quoting *Ashburn*, 306 Md. at 630–31, 510 A.2d at 1085)).

We also addressed the issue of duty to a third party in the context of a hunting party, in *Remsburg v. Montgomery*, 376

a police officer to the victim of a domestic violence incident, we determined that once the officer gave explicit direction to the victim to remain in the home and that he would protect her, that a special relationship may have been created, "further creating a duty to either remain or to inform them that he was leaving." *Id.* at 150–51, 753 A.2d at 68.

Md. 568, 831 A.2d 18 (2003). In *Remsburg*, the senior Mr. Remsburg organized a deer hunting party that included his son, James Remsburg, Jr., near property owned by the Montgomerys. The junior Remsburg, while waiting for the hunting season to officially begin in a few minutes time, heard trees rustling and fired his shotgun in the direction of the sound, without determining whether it was a deer. The slug from his weapon stuck Brian and Charles Montgomery, who had been part of another hunting party and were shielded from sight by trees, and caused severe injury. The Montgomerys sued the senior Remsburg, alleging that he, as the leader of the hunting party, owed Mr. Montgomery a duty to prevent harm caused by third parties. We, however relied on the general rule, articulated in *Ashburn*, that absent a special relationship, no duty is owed to members of the general public.

We also declined to impose a duty for harm caused by a third party in the context of product liability and "failure to warn" claims in *Gourdine v. Crews*, 405 Md. 722, 955 A.2d 769 (2008). In *Gourdine*, we considered whether a manufacturer of insulin medications should have been under a duty to warn the injured party, who was not taking the medication, of the risk that a patient who was taking the medication could suffer side effects and cause injury. We held that the manufacturer had no duty to the specific plaintiff, who had not alleged any special relationship, to warn her of the potential harm caused by a patient on its medication. We declined to adopt a policy that there was a duty to the general public regarding the harm caused by a third party, because such a concept would encompass an indeterminate number of individuals:

> In the case *sub judice*, there was no direct connection between [the manufacturer]'s warnings, or the alleged lack thereof, and Mr. Gourdine's injury. In fact, there was no contact between [the manufacturer] and Mr. Gourdine whatsoever. To impose the requested duty from [the manufacturer] to Mr. Gourdine would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by [the patient] after her ingestion of the drugs. Essentially, [the

manufacturer] would owe a duty to the world, an indeterminate class of people, for which we have resisted the establishment of duties of care.

*Id.* at 750, 955 A.2d at 786 (internal quotations omitted). *See also Patton v. USA Rugby Football,* 381 Md. 627, 638–44, 851 A.2d 566, 570–76 (2004) (using the special relationship test to determine whether the rugby association could be liable for a referee's alleged negligence in failing to cancel a game, at which a player and a spectator were struck by lightning).

█ The concept of special relationships, then, between the party sued and the injured party is the gravamen of our determinations of liability in third party duty cases. We have consistently recognized that, in the absence of control or a special relationship, there can be no duty to an injured person for harm caused by a third party. Our jurisprudence in this regard comports with the general understanding of duty as articulated in Dan B. Dobbs's *The Law of Torts* 474 (2000). He expressly noted that there is no "blanket duty" with respect to a tavern owner controlling the conduct of its intoxicated patrons:

Courts have said in many contemporary cases that in the absence of a special relationship, the defendant simply owes no duty to take affirmative action to protect the plaintiff from a third person. . . . Thus, if a duty of care is owed, taverns providing the alcohol that fuels criminal automobile driving, institutions releasing dangerous persons into the community, landlords leaving locks in disrepair, schools failing to protect students from attackers, and many others are now potentially subject to liability for harmful criminal behavior. *But there is no blanket duty any more than there is blanket immunity.*

█ In this case, the Warrs do not assert *any* relationship existed between themselves and Dogfish Head, and, therefore, there cannot be a duty owed to them by the tavern with respect to the harm caused by a third person.[14] Simply put,

---

14. The theory of liability advanced by the Warrs and embraced by the dissent would not be limited to commercial vendors of alcohol. A

we just do not recognize a duty; instead we adhere to the principle that "[h]uman beings, drunk or sober, are responsible for their own torts." *State v. Hatfield,* 197 Md. 249, 254, 78 A.2d 754, 756 (1951); *see also Valentine,* 353 Md. at 553, 727 A.2d at 951.

The Warrs also argue that various provisions of the Restatements (Second) and (Third) of Torts provide a foundation for dram shop liability. They primarily rely upon Section 283 of the Restatement (Second) of Torts,[15] which states that, "[u]nless the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances," to support a duty owed to the general public. Section 283, however, refers to the standard of care, rather than the existence of a duty of care; the standard of care is one measure of liability once a duty of care has been established. In and of itself, the standard of care does not create a duty of care. *See* William L. Prosser, Law

---

social host who provides alcohol to his or her guests engages in exactly the same conduct as a commercial vendor, and would, presumably, be exposed to the same liability. *See Kuykendall v. Top Notch Laminates, Inc.,* 70 Md.App. 244, 520 A.2d 1115 (1987) (refusing to impose liability on a social provider of alcohol because, absent a special relationship, there is no duty to control the conduct of a third party). Any provider of alcohol, such as social hosts, church groups, charitable organizations would be subject to liability. In essence, all providers of alcohol would be responsible for the conduct of all the persons to whom they dispense alcohol; however, we have constantly adhered to the principle that declaration of public policy is a legislative function. *Felder v. Butler,* 292 Md. 174, 183, 438 A.2d 494, 499 (1981) ("[T]he Court has always recognized that declaration of public policy is normally the function of the legislative branch of government.").

**15.** The Warrs also point to Section 449 of the Restatement (Second) of Torts, which states, "[i]f the likelihood that a person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for the harm caused thereby." Section 449 does not establish a duty, but assumes that were a duty to be owed, intervening acts, as was exemplified in *Horridge v. St. Mary's Co. Dept. of Social Services,* 382 Md. 170, 194–95, 854 A.2d 1232, 1246 (2004), may not necessarily break the chain of causation.

of Torts 205–07 (4th ed.1971) (explaining that the existence of a duty is a separate question from the appropriate standard of care).

The Warrs next point to comment c of Section 302 of the Restatement (Second) of Torts, which we referenced in *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993), as illustrative of the duty owed by Dogfish Head to refuse to serve drunken patrons. Comment c provides, in relevant part according to the Warrs, that an actor "may be negligent in setting in motion a force the continuous operation of which, without the intervention of other forces or causes, results in harm to another." The Warrs' claim that this comment is evidence that there exists a duty at common law, however, is without merit, as comment c goes on to state that "[s]uch continuous operation of a force set in motion by the actor, or of a force which he fails to control, is commonly called 'direct causation' by the courts, and very often the question is considered as if it were one of the mechanism of the causal sequence." Thus, the very citation used to support the Warr's argument eviscerates it, as Section 302 applies to causality, not duty. *See Reed*, 332 Md. at 240, 630 A.2d at 1152 (utilizing Section 302 to analyze causality, not duty of care).[16]

---

**16.** The Warrs also point to Sections 302A and 302B of the Restatement (Second) of Torts as potential sources of the duty owed by Dogfish Head to prevent the harm caused by Mr. Eaton. Section 302A states, "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person." Section 302B provides, "[a]n act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." The Warrs did not identify, nor can we find, any cases in which this Court has relied upon Section 302A or 302B; these Sections address foreseeability of harm and as applied in the present case, would mean foreseeability to the general public. As the Court stated in *Valentine v. On Target, Inc.*, 353 Md. 544, 553, 727 A.2d 947, 951 (1999), "[o]ne cannot be expected to owe a duty to the world at large to protect it against the actions of third parties, which is why the common law distinguishes different types of relationships when determining if a duty exists."

Section 315 of the Restatement (Second) of Torts, however, relating to controlling the conduct of third parties, has been employed by numerous courts adopting dram shop liability:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Section 315 of the Restatement (Second) of Torts.[17]  In *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200 (1983) (en banc), for instance, the Supreme Court of Arizona reviewed duty in the context of dram shop liability, stating:

We believe that changing social conditions require recognition of a duty which extends to innocent third parties and which is based on the relation of the licensed supplier of liquor and his patron.  We acknowledge that we deal here with defendant's obligation to help control the conduct of his patron in order to prevent that patron from injuring someone else.

---

**17.**  Section 37 of the Restatement (Third) of Torts: Liability for Emotional and Physical Harm, which replaced Sections 314 and 315 of the Restatement (Second) of Torts, is the final Section of the Restatement upon which the Warrs rely for the existence of a duty from Dogfish Head to them.  Section 37 states "[a]n actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38–44 is applicable."  The Warrs invoke Comments a and d of this Section to assert that the "no duty" rule espoused in Section 37, and formerly in Section 315, is not applicable in the instant case because, "Section 315, however, must be understood to address only an affirmative duty to control third parties.  It did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm."  Section 37 of the Restatement (Third) of Torts, Liability for Emotional and Physical Harm, cmt. d. We address the Warrs' arguments regarding a duty owed to the general public *infra*.

*Id.* at 208. Relying on a Pennsylvania case, *Jardine v. Upper Darby Lodge No. 1973, Inc.,* 413 Pa. 626, 198 A.2d 550 (1964), and invoking Section 315 of the Restatement (Second) of Torts, the court likened providing alcohol to an already intoxicated patron to giving a gun to a "demented individual," and held that "those who furnish liquor have an obligation or 'duty' to exercise care for the protection of others." *Ontiveros,* 667 P.2d at 211.

The Supreme Court of Texas also referenced Section 315 when it adopted dram shop liability in *El Chico Corp. v. Poole,* 732 S.W.2d 306 (Tex.1987), modified by statute, Texas Alcoholic Beverage Code (Supp.1993), Section 2.03, as recognized by *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993). In that case, the Texas Supreme Court considered whether it should alter its common law to recognize a cause of action sounding in dram shop liability. The court concluded that public attitudes toward drinking and driving as well as the information surrounding intoxication had changed sufficiently to warrant adoption, judicially, of dram shop liability. With respect to duty, the court opined that the employees of a tavern were under "the general duty to exercise reasonable care to avoid foreseeable injury to others," *id.* at 311, and that the tavern employees had a duty to control the conduct—drinking—of patrons to protect the general public. *Id.* at 312. The court noted that it had held over a century before that a tavern that allowed a patron to drink himself to death was liable to the patron's estate and cited Section 315 of the Restatement (Second) of Torts as reflective of the common law duty to "take affirmative action to control or avoid increasing the danger from another's conduct which the actor has at least partially created" as a natural extension of the previously recognized liability. *Id.*

We, though, have rejected extending the rationale of Section 315 to the general public in *Valentine v. On Target, Inc.,* 353 Md. 544, 553, 727 A.2d 947, 951 (1999), when we stated "[o]ne cannot be expected to owe a duty to the world at large to protect it against the actions of third parties, which is why the common law distinguishes different types of relationships

when determining if a duty exists. The class of persons to whom a duty would be owed under these bare facts would encompass an indeterminate class of people, known or unknown." We recently reaffirmed rejection of expansive liability under Section 315 in *Barclay v. Briscoe*, 427 Md. 270, 47 A.3d 560 (2012). In *Barclay*, we were asked to consider whether an employer was liable to an injured third party when an employee, who had been working 22 straight hours, was involved in a car accident on his way home. We held that he could not and noted, with respect to the issue of duty, that

[i]n the absence of either one of the kinds of special relations described in [Section 315 of the Restatement (Second) of Torts], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself.

*Id.* at 295, 47 A.3d at 575, quoting *Lamb v. Hopkins*, 303 Md. 236, 242 n. 4, 492 A.2d 1297, 1300 n. 4 (1985). In reaching the conclusion that there was no duty, we relied, in part, on the reasoning of our brethren on the Court of Special Appeals in *Kuykendall v. Top Notch Laminates, Inc.*, 70 Md.App. 244, 520 A.2d 1115 (1987), a case involving facts very similar to those now before us.

In *Kuykendall*, Evelyn Hargis was killed in a motor vehicle accident involving a drunk driver. Two employees of Top Notch Laminates were driving separate cars and were swerving back on forth on the roadway in "horse play." One of the employees swerved across the center line and struck the car driven by Ms. Hargis. The employees had been drinking at a company function for five-and-a-half hours before the accident and were highly intoxicated. Ms. Hargis's husband filed suit against Top Notch Laminates, alleging that the employees were obviously drunk and Top Notch Laminates was liable for negligently providing them alcohol. The Circuit Court grant-

ed Top Notch Laminates's motion to dismiss, and the Court of Special Appeals affirmed, stating, with respect to duty, "[t]he Court of Appeals has adopted the principle that there is no liability to a third person absent a 'special relationship' with a clear right to control." *Id.* at 249, 520 A.2d at 1117. The Warrs do not allege a special relationship between themselves and the owners of the Dogfish Head in their complaint, although special relationships have informed much of our recent jurisprudence regarding duty. *See Barclay v. Briscoe,* 427 Md. 270, 47 A.3d 560 (2012), *Gourdine v. Crews,* 405 Md. 722, 955 A.2d 769 (2008), *Remsburg v. Montgomery,* 376 Md. 568, 831 A.2d 18 (2003).[18] While other courts have embraced the concept of duty to control the conduct of its patrons under Section 315 of the Restatement (Second) of Torts, the Warrs disavow this rationale in favor of imposing a duty that Dogfish Head owed to the general public to refuse to serve intoxicated patrons.

The Warrs finally assert that the tavern owners owed a duty to refuse to serve an intoxicated patron, because there is a criminal statute prohibiting the sale of alcohol to visibly intoxicated persons. Section 12–108(a)(1) of Article 2B of the Maryland Annotated Code (1957, 2011 Repl.Vol.) states that a licensed vendor of alcohol may not sell alcohol:

(i) To a person under 21 years of age for the underage person's own use or for the use of any other person; or

(ii) To any person who, at the time of the sale, or delivery, is visibly under the influence of any alcoholic beverage.

In so doing, the Warrs rely on jurisprudence from sister courts that have extrapolated civil liability from criminal statutes.

---

**18.** The Warrs also argue that Section 19 of the Restatement (Third) of Torts, which states, "[t]he conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party," is a source of Dogfish Head's duty to refuse to sell alcohol to an intoxicated patron. We have not heretofore adopted Section 19, but more importantly, Section 19 assumes the existence of a duty of care which is breached when a defendant acts in concert with another.

The New Jersey Supreme Court, the first to judicially adopt dram shop liability, in. *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1 (1959), for instance, addressed a situation in which a tavern had sold alcohol to a minor, and was sued because the minor had driven home from the bar, colliding with a car driven by Arthur Rappaport, who was killed. After summary judgment was granted in favor of the tavern, noting that the common law rule was that taverns were not liable for injuries caused to third parties by intoxicated patrons, *id.* at 4, the patron appealed. In reversing, the court briefly discussed the duty owed by the tavern operators to not sell alcohol to intoxicated patrons, imposed because tavern owners were statutorily prohibited from selling alcohol to minors and those "actually or apparently intoxicated," "for the protection of members of the general public" as part of the licensing requirements to sell alcohol. *Id.* at 8.

The Maine Supreme Judicial Court, having been called upon to decide whether the Maine Dram Shop Act provided an exclusive remedy or whether the plaintiffs could maintain a traditional negligence action in *Klingerman v. SOL Corporation of Maine,* 505 A.2d 474 (Me.1986), acknowledged that there was a "safety" statute that imposed fines upon establishments that served visibly intoxicated persons. Based on this statute, the court evoked a duty: "[t]he statute achieves that objective by imposing a duty upon liquor licensees not to serve alcoholic beverages to visibly intoxicated patrons." *Id.* at 478.

In Massachusetts, its supreme court, in *Adamian v. Three Sons, Inc.,* 353 Mass. 498, 233 N.E.2d 18 (1968), also adopted dram shop liability based, in part, upon statutory enactments. In that case, the tavern owner operated a bar on a highway that had a large parking lot. A patron of the tavern consumed a large amount of alcohol and, after leaving, was involved in a car accident. In reviewing whether the plaintiff's complaint against the tavern should have been demurred, the court noted that the statute providing liability for tavern owners was repealed at the end of the Prohibition Era, but that "[t]he legislative policy, being clear, is not to be rendered futile of practical accomplishment because of the repeal at the end of

the prohibition era of the Dram Shop Act which gave an express right of action to persons suffering damage due to a violation of the act." *Id.* at 19. The court then held that tavern owners could be held liable under common law negligence for the sale of liquor to "already intoxicated individuals," *id.* at 20. Although most of the court's analysis was focused on the issue of proximate cause, the court stated, with respect to duty, that the tavern owner had a "duty to members of the general public using the public highways," *id.* at 19, that was imposed by virtue of a 1933 criminal statute that stated, "[n]o alcoholic beverage shall be sold or delivered on any premises licensed under this chapter to an intoxicated person." *Id.*

In Wyoming, the Supreme Court of Wyoming was even more explicit in its recognition of a duty to the entire public when adopting dram shop liability, in *McClellan v. Tottenhoff,* 666 P.2d 408 (Wyo.1983), modified by statute, 1985 Wyo. Sess. Laws ch 205, Section 1, as stated in *Daniels v. Carpenter,* 62 P.3d 555 (Wyo.2003). Wyoming had earlier decided that there was no liability on the part of taverns for injuries caused by a drunken patron, *Parsons v. Jow,* 480 P.2d 396 (Wyo.1971), noting that the basis for such a holding was that "[t]here may be sales without intoxication, but no intoxication without drinking." *McClellan,* 666 P.2d at 409 (internal quotation omitted). In overturning its decision in *Parsons,* the Supreme Court of Wyoming noted that there was a statute that provided for civil liability if a tavern served alcohol to either a minor or a habitual drunkard, but only if the tavern had been given written notice of such. *McClellan,* 666 P.2d at 410. The court then explicitly noted that it was importing a duty from a statute that made it illegal to sell or furnish alcohol "to a minor or intoxicated person in the area," Section 12–5–301 of Wyoming Statutes Annotated (1977), designed to prohibit intoxicated persons from being served. *Id.* at 413.

This Court historically, however, has not extrapolated civil liability from criminal statutes regulating the sale of alcohol, unlike some of our sister states. Indeed, an earlier version of Section 12–108, the current prohibition on selling alcohol to

intoxicated persons, was in effect at the time *Felder* was decided. In that case, we explicitly rejected the notion that the existence of a criminal statute was sufficient to establish civil liability, because the Legislature had not enacted laws to impose civil liability:

> At that time the public policy of the State, declared by the legislature in what is now § 118(a) of Article 2B, imposed only criminal sanctions upon a licensed vendor of alcoholic beverages who sold or furnished intoxicants to minors or persons visibly under the influence of alcohol. The absence of any statute in Maryland creating a civil cause of action in such circumstances prompted the Court in *Hatfield* to conclude that the legislature did not intend to impose civil liability upon alcoholic beverage vendors for the tortious acts of their intoxicated customers. The state of the statutory law has remained unchanged since *Hatfield* was decided thirty years ago.

*Felder*, 292 Md. at 183–84, 438 A.2d at 499.[19]

Where we have imposed civil liability on the basis of a criminal statute, we have required a party to show: "(a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 79, 835 A.2d 616, 621 (2003); *see also Wietzke v. Chesapeake Conference Association*, 421 Md. 355, 388, 26 A.3d 931, 951 (2011); *Remsburg v. Montgomery*, 376 Md. 568, 584, 831 A.2d 18, 37 (2003). The statutes regulating the sale of alcohol and prohibiting its provision to those visibly intoxicated were enacted "for the protection, health, welfare and safety of the people of this State." Maryland Code (1957, 2011 Repl.Vol.), Article 2B, Section 1–101(a)(3). Our jurisprudence establishes that this general class of individuals is not sufficient to create a tort duty because, "we have always required the statute or ordi-

---

19. The *Hatfield* Court also noted that there was a statute in effect at the time that made it illegal to sell alcohol to a minor, *State v. Hatfield*, 197 Md. 249, 251, 78 A.2d 754, 755 (1951), but did not discuss the statute.

nance allegedly violated to set forth mandatory acts that are clearly for the protection of a *particular class* of persons and *not* merely for the public as a whole." *Wietzke,* 421 Md. at 388, 26 A.3d at 951 (internal quotations omitted) (emphasis in original); *see also Ashburn v. Anne Arundel County,* 306 Md. 617, 635, 510 A.2d 1078, 1087 (1986) ("In order to impose a special relationship between police and victim, and thereby to create a duty in tort, however, a statute must 'set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole.' "(emphasis in original) (citations omitted)). Thus, the existence of criminal statutes prohibiting the sale of alcohol to intoxicated individuals is not sufficient to support liability in the instant case, because the statute does not identify a particular class of protectees.

As a result, in holding that Dogfish Head did not owe a duty to the Warrs, as members of the general public, we also value the words of our colleagues on the Supreme Court of Delaware who, in *Shea v. Matassa,* 918 A.2d 1090, 1094 (Del.2007), quoting *McCall v. Villa Pizza, Inc.,* 636 A.2d 912, 913 (Del. 1994), stated: "The essential rationale underlying this line of cases is that the determination of whether to impose liability on tavern owners for injuries caused by intoxicated patrons involves significant public policy considerations and is best left to the General Assembly." The Legislature, as the Delaware court noted, "is in a far better position that this Court to gather the empirical data and to make the fact finding necessary to determine what the public policy should be. . . ." *Id.,* quoting *Wright v. Moffitt,* 437 A.2d 554 (1981). We agree.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

HARRELL, ADKINS, and McDONALD, JJ., dissent.

ADKINS, J., dissenting.

On August 21, 2008, Michael Eaton entered JMGM's bar where, over a six-hour period, he was served at least twenty-

one alcoholic drinks, to the point of becoming violent and aggressive. Eaton then left the bar, got in his car, drove down the road at eighty-eight to ninety-eight miles per hour, collided with another car, and killed an innocent ten-year-old child.

Unfortunately, the facts of this case are not unusual or extreme. In Maryland, over 24,000 people are arrested every year for driving under the influence of alcohol. *See* Task Force to Combat Driving Under the Influence of Drugs and Alcohol, *Findings and Recommendations* 1–2 (2008). These drunk drivers come largely from bars and commercial vendors—just like the establishment owned by JMGM. *See* Nat'l Highway Traffic Safety Admin., *Preventing Over-consumption of Alcohol—Sales to the Intoxicated and "Happy Hour" (Drink Special) Laws* 2 (2005); A. James McKnight & Fredrick M. Streff, *The Effect of Enforcement Upon Service of Alcohol to Intoxicated Patrons of Bars and Restaurants*, 26 Accid. Anal. & Prev. 79, 79 (1994). They then cause an average of 4,899 accidents every year in Maryland. *See* Task Force at 1–2. And sadly, the result is often no different than what happened in this case: "an average of **220 people died annually** as a result of impaired-driving-related crashes on Maryland roads.... This equates to **18 deaths a month** or **a death every 40 hours** ...." *Id.* (emphasis added).

Against the backdrop of this crisis, this case presented the opportunity to impose dram shop liability on commercial vendors of alcohol[1] that continue to serve patrons after they are "visibly under the influence." Scientific studies have consistently found strong evidence showing that dram shop liability "reduce[s] motor vehicle crash deaths in general and alcohol-related crash deaths in particular." Veda Rammohan, et al.,

---

1. I use the term "commercial vendors of alcohol" to refer to any entity authorized by the Alcohol Beverages laws of Maryland to offer and serve alcohol for on-site sale and consumption. Throughout this opinion I also use the terms "bar" and "tavern" in place of "commercial vendors of alcohol." This is done for the sake of brevity, and all three terms are used in this opinion to represent the same class of establishments as defined above.

*Effects of Dram Shop Liability and Enhanced Overservice Law Enforcement Initiatives on Excessive Alcohol Consumption and Related Harms,* 41 Am. J. Prev. Med. 334, 340 (2011).[2] The National Highway Traffic Safety Administration agrees with this conclusion, explaining that "[s]tudies indicate that enforcement and prosecution of dram shop laws (and resulting case decisions) are associated with a substantial reduction in alcohol-related harm." Nat'l Highway Traffic Safety Admin., at 5. Specifically, several studies "that assessed the effects of dram shop liability on alcohol-related motor vehicle fatalities found a median reduction of 6.4% (range of values 3.7% to 11.3% reduction)." Rammohan, at 339. With 220 deaths caused by alcohol-related crashes each year in Maryland, a 6.4% reduction would save 14 lives every year.

---

**2.** This study is the product of the Task Force on Community Preventive Services, which was created by the United States Department of Health and Human Services (DHHS) in 1996 to develop guidance on which community-based health promotion and disease prevention interventions work and which do not work, based on available scientific evidence. The review team included "systematic review methodologists and subject matter experts from a range of agencies, organizations, and academic institutions." *Id.* at 336. It consisted of nine authors from institutions such as the Community Guide Branch of the Epidemiology and Analysis Program Office, the National Center for Chronic Disease Prevention and Health Promotion, the Los Angeles County Department of Health Services, the Division of Epidemiology and Community Health at the University of Minnesota School of Public Health, and the Section of General Internal Medicine from the Boston Medical Center.

The team collected all of the available scientific evidence on the topic, screening out those studies that did not satisfy their criteria for inclusion in the systematic review. In order to qualify for this review, a study had to "[e]valuate the effectiveness of dram shop liability or initiatives for enhanced enforcement of overservice regulations that could and did apply legal or administrative sanctions," "[b]e conducted in a country with a high-income economy, be primary research . . ., and be published in English," and it had to "[c]ompare attributes of participants before and after the implementation of the intervention or compare a group receiving the intervention with a group not receiving it." *Id.* at 337. The review then discussed the effectiveness of dram shop liability as shown by the results of the studies; the potential harms, additional benefits, and barriers to implementation of dram shop liability; the applicability of the results to different segments of the population; the costs and benefits of imposing dram shop liability; any weaknesses or gaps in the research of the underlying studies; and explained the conclusions of the review team.

In 1981, the last time this Court took up the issue of dram shop liability, we stated that **"for now"** we would wait and permit the legislature to address this problem area. *See Felder v. Butler,* 292 Md. 174, 184, 438 A.2d 494, 499 (1981). After thirty-two years of inaction by the General Assembly, I urge that we no longer sit idly by, and refuse to help, as people continue to die at such a rate. *See, e.g., Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349, 352 (1997) ("Despite this Court's preference for legislative action, there has been no action directly addressing this troublesome question [of dram shop liability]; so, we will address this issue now."); *McClellan v. Tottenhoff,* 666 P.2d 408, 415 (Wyo.1983) ("We do not choose to stand by and wring our hands at the unfairness which we ourselves have created."). I submit that we can save lives by recognizing dram shop liability and do so based on the well-established principles of our common law.

The Majority, in holding that JMGM does not owe a duty to the Warrs, is quick to state that it "do[es] not write on a blank slate." Maj. Op. at 178, 70 A.3d at 351–52. Yet, the Majority immediately abandons the reasoning of this Court's precedent, which was based on proximate cause, and instead, creates its own duty-of-care analysis. As I will explain, not only does the Majority disregard our precedent, but its new analysis is inconsistent with our established duty-of-care jurisprudence.

### Common Law Rule Regarding Dram Shop Liability

The concept of "dram shop liability" is a legal term of art used to refer to the "[c]ivil liability of a commercial seller of alcoholic beverages for personal injury caused by an intoxicated customer." *Black's Law Dictionary* 568 (Bryan A. Garner et al. eds., 9th ed.2009). Dram shop liability did not exist under the traditional common law rule. This was because the rule "was predicated on the theory that the drinking rather than the serving of alcohol was the proximate cause of intoxication." Frank A. Sloan, et al., *Drinkers, Drivers, And Bartenders: Balancing Private Choices and Public Accountability* 118 (2000). Under this rationale, "even if a vendor breached a duty to those injured by an

intoxicated person, the vendor was not legally liable because he was not considered the proximate cause of the injuries." *Id.* Accordingly, the sole rationale supporting the traditional common law rule was that "the chain of legal causation between the negligent serving of an alcoholic beverage and the injury was severed by the customer's voluntary act in drinking the alcohol." *Id.; see also* Ronald S. Beitman, *Practitioner's Guide to Liquor Liability Litigation* 3 (1987).

This traditional common law rule was recognized in Maryland in the case of *State v. Hatfield,* 197 Md. 249, 78 A.2d 754 (1951). In that case, a bar served alcohol to a minor and did so even after he had become intoxicated. *Id.* at 251, 78 A.2d at 755. The minor then got back into his car and drove away from the bar, colliding with another car and killing the other driver. *Id.* In holding that the bar was not liable, the Court explained that "the common law knows no right of action against a seller of intoxicating liquors, as such, for **'causing'** intoxication of the person whose negligent or wilful wrong has caused injury." *Id.* at 254, 78 A.2d at 756 (emphasis added). Explaining further, the Court stated: "[t]he law (apart from statute) recognizes no relation of **proximate cause** between a sale of liquor and a tort committed by a buyer who has drunk the liquor." *Id.* (emphasis added).

What is clear, then, is that when this Court refused to recognize dram shop liability for the first time, it did so based on the traditional common law understanding that the selling of alcohol was not a proximate cause of the injury suffered by the third person. Indeed, in the entire *Hatfield* opinion, the word "duty" never once appears. *Hatfield,* then, provides no support for the Majority's "no duty" holding.

Following *Hatfield,* this Court has addressed dram shop liability on only one other occasion—in *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981)—but broke no new ground and followed, in lockstep, the decision in *Hatfield.* While the *Felder* Court recognized a "new trend of cases" that found a duty on the part of the bar as to an injured third person, it did not discuss duty of care. *Id.* at 178, 438 A.2d at 496. Instead,

the Court, with some apparent reluctance, followed *Hatfield* and based its holding on older proximate cause decisions:

Therefore, since the legislature has not yet created dram shop liability by statute, we decline, **for now,** to join the new trend of cases [in this area]. Nevertheless, the legislature may wish to consider reexamining the *Hatfield* **rule** to determine if the public policy of the State continues to favor a rule which, in any and all circumstances, precludes consideration of whether the sale of intoxicating liquor to an inebriated tavern patron may be a **proximate cause** of subsequent injury caused to others by the intoxicated customer. (Emphasis added).

*Id.* at 184, 438 A.2d at 499. These two, our only cases on dram shop liability, demonstrate that this Court's refusal to recognize dram shop liability has been based solely on the old common law rule that the selling of alcohol was not a proximate cause of injuries resulting from the subsequent torts of an intoxicated customer. Therefore, the Majority's opinion, resting on the absence of any duty of care to a third person injured by an intoxicated customer, is not based on Maryland precedent; it is an alternative approach that has never been taken by this Court before.

I apply our well-established principles of common law negligence to this case and explain how the Majority leads our duty-of-care jurisprudence astray.

### Duty of Care

This Court has adopted the often quoted passage from Prosser and Keeton's definition of the term "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See, e.g., Remsburg v. Montgomery,* 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (quotation marks omitted) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed.1984)). Under this definition, however, "[i]n the determination of the existence of a duty, there runs through much of the law a distinction between action and inaction." Keeton, § 56, at 373. As Prosser and Keeton explain: "there

arose very early a difference, still deeply rooted in the law of negligence, between 'misfeasance' and 'nonfeasance'—that is to say, between active misconduct working positive injury to others and passive inaction or a failure to take steps to protect them from harm." *Id.* In explaining this distinction, Prosser and Keeton state: "by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs." *Id.*

As a result, the existence of a duty depends on whether the case involves active risk creation or passive failure to act:

Liability for 'misfeasance,' then, may extend to any person to whom harm may reasonably be anticipated as a result of the defendant's conduct, or perhaps even beyond; while for 'nonfeasance' it is necessary to find some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act. (Footnotes omitted).

*Id.* § 56, at 374.

Under this definition that Maryland adopted from Prosser and Keeton, there are two overarching duty rules. First, when a person chooses to act, he owes a duty to exercise reasonable care so as not to expose others to unreasonable risks of harm. *See, e.g., B.N. v. K.K.,* 312 Md. 135, 141, 538 A.2d 1175, 1178 (1988) ("The notion of duty is founded on the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others." (citations and quotation marks omitted)); *Moran v. Faberge, Inc.,* 273 Md. 538, 543, 332 A.2d 11, 15 (1975) ("To begin with we note that a manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others."). Second, when a person is merely a passive observant, he ordinarily does not owe a duty to affirmatively aid or rescue another to prevent them from suffering harm, absent the creation of a special relationship that would justify imposing a duty to take affir-

mative action for the benefit of another. *See, e.g., Barclay v. Briscoe*, 427 Md. 270, 294, 47 A.3d 560, 574–75 (2012) ("[T]here is no duty to control a third person's conduct so as to prevent personal harm to another, unless a special relationship exists." (citation and quotation marks omitted)). Or, as Prosser and Keeton explained: "If there is no duty to go to the assistance of a person in difficulty or peril, **there is at least a duty to avoid any affirmative acts which make his situation worse.**" Keeton, § 56, at 378 (emphasis added).

### Bar's Conduct Affirmatively Created Risk of Harm

Before we decide whether the bar could owe a duty to the Warrs, we must determine which of these duty rules will govern this case. To do this, we examine whether the bar's conduct was active or passive. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 cmt c. (2012) ("[T]he factfinder would have to determine whether an actor's conduct created a risk of harm as a predicate for determining whether a duty exists under [the exercise of reasonable care] or whether a duty, if any, must be found in [an exception to the no-duty rule]."). If the bar's conduct was merely passive, then the bar will not be subject to any duty to the Warrs, unless the Warrs can prove that a special relationship or other affirmative duty was created. If the bar's conduct actively created a risk of harm, then the duty potentially imposed on the bar will be the ordinary duty to exercise reasonable care. In that case, the rule excluding one from a duty to control a third person's conduct does not apply. Thus, the bar's liability "may extend to any person to whom harm may reasonably be anticipated as a result of the defendant's conduct." Keeton, § 56, at 374.

I use the familiar terms "active" and "passive" conduct at the risk of being overly simplistic. More precisely, the inquiry is not whether the defendant performed an act or failed to perform an act.[3] Rather, the inquiry is whether the defen-

---

**3.** Illustrating how a focus on finding an act or omission can mislead the inquiry, Prosser and Keeton explain:

dant's conduct created a risk of harm.[4] *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 cmt. c. (2012) ("The proper question is not whether an actor's failure to exercise reasonable care entails the commission or omission of a specific act. Instead, it is whether the actor's entire conduct created a risk of harm.").[5] The defendant's conduct will be found to create a risk of harm "when the actor's conduct or course of conduct results in greater risk to another than the other would have faced absent the conduct." *Id.* § 7 cmt. o. This "greater risk" includes "risk by exposing another to the improper conduct of third parties." *Id.*

---

> It is clear that it is not always a matter of action or inaction as to the particular act or omission which has caused the plaintiff's damage. Failure to blow a whistle or to shut off stream, although in itself inaction, is readily treated as negligent operation of a train, which is affirmative misconduct; an omission to repair a gas pipe is regarded as negligent distribution of gas; and failure to supply heat for a building can easily become mismanagement of a boiler. On the other hand, discharge of an employee, which is certainly an affirmative act, may be considered to be no more than non-performance of an agreement to continue employment, and a similar conclusion has been reached as to revocation of a theater ticket and expulsion of a patron. (Footnotes omitted).

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 374–75 (5th ed.1984).

4. Put another way, Prosser and Keeton frame the inquiry as:

> The question appears to be essentially one of whether the defendant has gone so far in what he has actually done, and has got himself into such a relation with the plaintiff, that he has begun to affect the interests of the plaintiff adversely, as distinguished from merely failing to confer a benefit upon him.

Keeton, § 56, at 375.

5. Illustrating the difference, the Restatement states:

> For example, a failure to employ an automobile's brakes or a failure to warn about a latent danger in one's product is not a case of nonfeasance ... because in these cases the entirety of the actor's conduct (driving an automobile or selling a product) created a risk of harm. This is so even though the specific conduct alleged to be a *breach* of the duty of reasonable care was itself an omission.

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 cmt. c. (2012).

In this case, Eaton entered JMGM's bar at approximately 5 P.M. on August 21, 2008. For the next six hours, the bar allegedly served him at least twenty-one alcoholic beverages to the point of Eaton becoming violent and aggressive. The bar, thus, took a non-dangerous Eaton and, by serving him drink after drink after drink, helped to transform him into a dangerous Eaton. Based on these facts, the jury could reasonably conclude that the bar's conduct, in over-serving Eaton, actively created a risk of harm to the Warrs and others, by exposing the Warrs to a greater risk than they would have faced absent the bar's conduct.

Because the bar's alleged conduct may have created a greater risk of harm, it falls into the category of active conduct and constitutes misfeasance, not nonfeasance. As a result, the bar cannot avoid liability "to any person to whom harm may reasonably be anticipated as a result of the [the bar's] conduct." Keeton, § 56, at 374. As this Court has often explained:

> The notion of duty is founded on **the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others.** When a reasonable person knows or should have known that certain types of conduct constitute an unreasonable risk of harm to another, he or she has the duty to refrain from that conduct. (Emphasis added).

*B.N.*, 312 Md. at 141, 538 A.2d at 1178 (emphasis added) (citations and quotation marks omitted); *see also Balt. Gas & Elec. Co. v. Flippo*, 348 Md. 680, 700, 705 A.2d 1144, 1154 (1998); *Faya v. Almaraz*, 329 Md. 435, 448, 620 A.2d 327, 333 (1993); *Moran*, 273 Md. at 543, 332 A.2d at 15; *McCance v. Lindau*, 63 Md.App. 504, 514, 492 A.2d 1352, 1358 (1985); *Ghassemieh v. Schafer*, 52 Md.App. 31, 40, 447 A.2d 84, 88–89 (1982).

### *Majority Applies Wrong Standard*

The Majority ignores this ordinary duty "to exercise due care to avoid unreasonable risks of harm to others," by relying on precedent which states: "the general rule followed in most jurisdictions, including Maryland, is that 'there is no duty to

control a third person's conduct so as to prevent personal harm to another, unless a special relationship exists either between the actor and the third person or between the actor and the person injured.' " *Barclay,* 427 Md. at 294, 47 A.3d at 574–75 (footnote omitted) (quoting *Ashburn v. Anne Arundel Cnty.,* 306 Md. 617, 628, 510 A.2d 1078, 1083 (1986)); *see* Maj. Op. at 183–90, 70 A.3d at 354–59.

By applying this rule in the context of dram shop liability, the Majority shows a fundamental misunderstanding of the concept of duty of care, and consequently, applies the wrong standard in this case. As I explained, this "special relationship" standard comes into play only when the actor's conduct is passive. The Majority fails to recognize this point, and as a result, erroneously requires the "special relationship" even when the conduct actively creates a risk of harm to a third party.

*Active vs. Passive Distinction in the Restatement*

Maryland has adopted the rule, on which the Majority relies, that—absent a special relationship—an individual has no duty to prevent a third person from causing harm to another, directly from Section 315 of the Second Restatement of Torts. Section 315 provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1965); *see Barclay,* 427 Md. at 294–97, 47 A.3d at 574–76.

Section 315 is found within the "Duties of Affirmative Action" topic of the Second Restatement. As this Court has repeatedly recognized, Section 315 "is a special application of the general rule set forth in § 314," which governs more

broadly the duty to take affirmative action for the protection of others.[6] *See, e.g., Lamb v. Hopkins,* 303 Md. 236, 242, 492 A.2d 1297, 1300 (1985). These sections discuss an individual's affirmative duties and provide the general starting point that an individual ordinarily owes no duty to protect another or to control the conduct of a third person unless certain exceptions are met. These sections may fairly be characterized as the "no duty to aid or rescue" provisions of the Restatement.

As the commentary to the Second Restatement makes clear, these rules apply **only** when an individual **passively fails** to aid or rescue another and do not apply when the individual actively places another in peril:

> The rule stated in this Section **applies only where the peril** in which the actor knows that the other is placed **is not due to any active force** which is under the actor's control. If a force is within the actor's control, his failure to control it is treated as though he were actively directing it and not as a breach of duty to take affirmative steps to prevent its continuance (see § 302, Comments *a* and *c*). (Emphasis added).

Restatement (Second) of Torts § 314 cmt. d (1965). To demonstrate this distinction between the control of active force and mere passive observance, the Second Restatement provides us with the following illustration:

> A, a trespasser in the freight yard of the B Railroad Company, falls in the path of a slowly moving train. The conductor of the train sees A, and by signaling the engineer could readily stop the train in time to prevent its running over A, but does not do so. While a bystander would not be liable to A for refusing to give such a signal, the B Railroad

---

6. Section 314 provides:
   § 314. Duty To Act For Protection Of Others
      The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.
   *Restatement (Second) of Torts* § 314 (1965).

is subject to liability for permitting the train to continue in motion with knowledge of A's peril.

*Id.* § 314 cmt. d, illus. 3. In other words, the rules in Section 314 and 315 would protect the bystander, so that the bystander does not owe a duty of care to A, because the bystander was merely passive and did not actively perform an act of force contributing to the harm suffered by A. The rules in Section 314 and 315 would not, however, apply to the B Railroad because the Railroad engaged in an act of force by driving the train, had control over that force, had knowledge of A's peril, but failed to control that force by not stopping the train. Thus, the Railroad would owe the ordinary duty of care to A.

To further demonstrate the distinction between the situations when Sections 314 and 315 apply and when they do not, the Second Restatement directs our attention to the commentary following Section 302.[7] That commentary explains that the ordinary duty of care will apply when an individual engages in active risk creation, as opposed to passive failure to act:

> In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty.

*Id.* § 302 cmt. a. The commentary then continues:

> The actor may be negligent in setting in motion a force the continuous operation of which, without the intervention

---

**7.** Section 302 sets forth the duty of ordinary care when the risk of direct or indirect harm is created:

> A negligent act or omission may be one which involves an unreasonable risk of harm to another through either
>> (a) the continuous operation of a force started or continued by the act or omission, or
>> (b) the foreseeable action of the other, a third person, an animal, or a force of nature.
>
> *Id.* § 302.

of other forces or causes, results in harm to the other. He may likewise be negligent in failing to control a force already in operation from other causes, or to prevent harm to another resulting from it.

*Id.* § 302 cmt. c.

What is clear then—after reading Sections 314 and 315, the accompanying commentary and illustrations, and contrasting it to Section 302—is that the "special relationship" rule in Section 315, which we adopted as Maryland's common law, simply does not apply in this case. Instead, the Restatement clearly contemplates that a defendant (the bar), who creates a risk of harm is under the ordinary duty to exercise reasonable care and may be negligent if it (the bar) actively creates an unreasonable risk that a third person (Eaton) will do harm to another (the Warrs). Thus, Section 315 of the Second Restatement, on which the Majority bases its holding, does not actually support the Majority's opinion.

Further undermining the Majority's opinion is the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, which confirms my understanding of the rules found in Section 314 and 315, and leaves no doubt that these sections do not apply in this case. Sections 314 through 320 of the Second Restatement, which we adopted as part of Maryland's common law, are now found at Sections 37 through 44 of the Third Restatement.[8] Section 37, which takes the place of both

---

8. It should be noted that this Court has not yet had the opportunity to evaluate Sections 37 through 44 of the Third Restatement of Torts, and therefore, have not adopted them as part of Maryland law. Nevertheless, upon reviewing Section 37, and comparing it to Sections 314 and 315 of the Second Restatement of Torts—which we have expressly adopted as Maryland law—I can find no substantive distinction between the two that would justify our departure from these rules. Therefore, I advocate that this Court expressly adopt Section 37 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. For examples of courts which previously followed Section 315 of the Second Restatement, but now apply Section 37 of the Third Restatement, see *Iseberg v. Gross*, 227 Ill.2d 78, 316 Ill.Dec. 211, 879 N.E.2d 278, 290–91 (2007); *Coombes v. Florio*, 450 Mass. 182, 877 N.E.2d 567, 575 n. 7 (2007); *Ginapp v. City of Bellevue*, 282 Neb. 1027, 809 N.W.2d

Section 314 and 315, explains that the rule applies only in the context of a passive failure to act and does not protect an individual who engages in active risk creation:

> An **actor whose conduct has not created a risk** of physical or emotional harm to another has **no duty** of care to the other unless a court determines that one of the affirmative duties provided in §§ 38–44 is applicable. (Emphasis added).

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (2012). In explaining the history of Section 37, the commentary to the Third Restatement explicitly confirms my reading of Section 314 and 315 above:

> *a. History.* Section 314 of the Restatement Second of Torts provided that knowledge that another was at risk and the ability to prevent or ameliorate the risk are insufficient to impose a duty. However, the **distinction between active risk creation and passive failure to act** in the face of a danger that was not the doing of the actor was relegated to commentary. Section 315 of the Second Restatement stated a more specific rule, subsumed within § 314, that an actor owed no duty to control third parties, subject to stated exceptions. **Section 315,** however, neglected to clarify that its **no-duty rule was conditioned on the actor having played no role in facilitating the third party's conduct,** such as by providing a dangerous weapon to an insane individual. See Comment *d.* This Section replaces both § 314 and § 315 of the Second Restatement. (Emphasis added).

*Id.* § 37 cmt. a.

Directly refuting the Majority, the Third Restatement explicitly warns against the holding which the Majority now imposes:

> Section 315 of the Restatement Second of Torts contributed to frequent judicial pronouncements, contrary to the

---

487, 492–93 (2012); *Satterfield v. Breeding Insulation Co.,* 266 S.W.3d 347, 359–60, 362–63 (Tenn.2008).

explanation above, that absent a special relationship an actor owes no duty to control third parties. **Section 315, however, must be understood to address only an affirmative duty to control third parties. It did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm.** The Restatement Second of Torts § 302B, Comment e, provides for a duty of care when "the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct." Section 449 of the Second Restatement also contemplated liability, without regard to any special relationship, for acts that are negligent because of the risk of the third party's conduct. (Emphasis added). *Id.* § 37 cmt. d.

The Third Restatement establishes that an individual who engages in active risk creation is subject to the ordinary duty of reasonable care:

§ 7. Duty

(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.

*Id.* § 7. Under this duty rule, "[w]hen an actor's conduct creates a risk of harm, this Section requires that the actor exercise reasonable care in connection with that conduct." *Id.* § 7 cmt. k. To determine when an actor's conduct creates a risk of harm, the Third Restatement explains:

o. *Conduct creating risk.* An actor's conduct creates a risk when the actor's conduct or course of conduct results in greater risk to another than the other would have faced absent the conduct. Conduct may create risk by exposing another to natural hazards, as, for example, when a pilot of an airplane flies the plane into an area of thunderstorms. Conduct may also create risk by exposing another to the improper conduct of third parties.

*Id.* § 7 cmt. o. The commentary also explains how the duty rule of Section 7 relates to the rule contained in Section 37:

*l. Relationship with affirmative duties to act.* The general duty rule contained in this Section is conditioned on the actor's having engaged in conduct that creates a risk of physical harm. Section 37 states the obverse of this rule: In the absence of conduct creating a risk of harm to others, an actor ordinarily has no duty of care to another. Section 37 is contained in Chapter 7, which addresses the no-duty-to-rescue rule, along with its exceptions.

*Id.* § 7 cmt. l.

Further showing this distinction, the Third Restatement provides that conduct can be negligent based on the prospect of improper conduct by a third party: "The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party." *Id.* § 19. In this context, the Restatement explains the distinction between active risk creation and passive failure to act by stating:

> These cases, in which the defendant's conduct creates or increases the possibility of harm caused by third-party misconduct, can be contrasted to cases in which the defendant merely takes no action to protect the plaintiff against the possibility of third-party misconduct. Because, as a general rule, the law does not impose an obligation to protect or rescue, defendants are liable in such cases only if they are subject to some affirmative duty providing an exception to the general rule.

*Id.* § 19 cmt. e. As way of illustration, the Restatement provides:

> a bystander owes no duty of care to an individual being assaulted on a public street. On the other hand, an actor's conduct may increase the natural or third-party risk—such as by inciting a swimmer to swim despite a dangerous riptide **or by providing** a weapon or **alcohol** to an assaulter. . . . In these cases, the actor's conduct creates risks of its own and, therefore, is governed by the ordinary duty of reasonable care contained in § 7. Section 19 specifically addresses the duty of reasonable care when an actor's

conduct increases the risk of third-party conduct that causes harm. (Emphasis added).

*Id.* § 37 cmt. d.

The Restatements, both the Second and the Third, clearly envision that the rule of Section 315, on which the Majority relies, applies only when the defendant's conduct constitutes a passive failure to aid or recuse another. And, it has no applicability when the defendant's own conduct creates a risk of harm to another.

### Active vs. Passive Distinction in Maryland Case Law

Until the Majority's opinion today, our case law had been perfectly in line with this explanation. Until today, this Court had applied the "special relationship" rule of Section 315 only to cases in which the defendant was passive and did not contribute to the harm suffered by the plaintiff.[9]

The first case to discuss Section 315 was *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976). At issue in *Scott* was whether a landlord owes a duty of care to his tenants to protect them from the criminal acts of a third party that occur in the common areas under the landlord's control. *Id.* at 161–62, 359 A.2d at 550. We declined to apply Section 315 to this case even though it involved the conduct of a third person. Instead, we held that "[t]he duty of a landlord is to exercise reasonable care for the tenant's safety, and traditional principles of negligence . . . will determine whether the landlord is liable for an injury resulting from a breach of this duty, including an injury caused by criminal acts of third parties."

---

**9.** Indeed, the Restatement Third actually cites our case law—including *Valentine v. On Target, Inc.*, 353 Md. 544, 551–52, 727 A.2d 947, 950 (1999) and *Pulliam v. Motor Vehicle Administration*, 181 Md.App. 144, 155, 955 A.2d 843, 850 (2008)—as examples of decisions properly applying Section 315, but then adds: "To be accurate, these statements about the lack of a duty to control third parties need qualification: an actor owes a duty of reasonable care when the actor's conduct contributes to the risk of a third party harming another." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37, reporters' notes cmt. d (2012). I believe it is time for us to make this qualification clear.

*Id.* at 167, 359 A.2d at 553. As a result, "[i]f the landlord knows, or should know, of criminal activity against persons or property in common areas, he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity." *Id.* at 169, 359 A.2d at 554.

The next case to consider Section 315 was *Lamb v. Hopkins,* in which we were asked to decide "whether a probation officer who fails to report a probationer's violation to the sentencing court owes any duty to an individual injured by the negligence of the probationer." 303 Md. 236, 238, 492 A.2d 1297, 1298 (1985). The Court adopted Section 315 as the general rule, under which "absent a special relation between the actor and third person, the actor has no duty to control the conduct of a third person and therefore no liability attaches for the failure to control that person." [10] *Id.* at 242, 245, 492 A.2d at 1300, 1302. The Court then applied Section 315 and held that no special relationship was formed. *Id.* at 248–49, 492 A.2d at 1301, 1304. Thus, the probation officer did not owe a duty to the third person because, at all times, he was passive—i.e. he merely failed to report the probationer's violations—and did not actively contribute to the harm suffered by the plaintiff. In such a situation, the rule of Section 315 properly applies.

The Court addressed Section 315 again in *Valentine v. On Target, Inc.,* 353 Md. 544, 727 A.2d 947 (1999). In that case, we considered "what, if any, tort duty a gun store owner owes

---

**10.** In adopting Section 315, it appears that this Court appreciated that the rule of Section 315 applies only to cases where the defendant passively failed to act. To illustrate the application of Section 315, this Court quoted the Restatement's commentary which provides the following scenario as an illustration of Section 315:

if the actor is riding in a third person's car merely as a guest, he is not subject to liability to another run over by the car even though he knows of the other's danger and knows that the driver is not aware of it, and knows that by a mere word, recalling the driver's attention to the road, he would give the driver an opportunity to stop the car before the other is run over.

*Lamb v. Hopkins,* 303 Md. 236, 242 n. 4, 492 A.2d 1297, 1300 n. 4 (1985) (quoting Restatement (Second) of Torts § 315 cmt. b (1965)).

to third parties to exercise reasonable care in the display and sale of handguns to prevent the theft and the illegal use of the handguns by others against third parties." *Id.* at 546, 727 A.2d at 948. The Court recognized that the rule of Section 315 applies only "with respect to a duty to aid" type case. *Id.* at 552, 727 A.2d at 951 (citation and quotation marks omitted). Conversely, the Court also recognized that the ordinary duty to exercise reasonable care applies when the defendant actively creates the risk or opportunity for harm. *Id.* at 552–53, 727 A.2d at 951. Because the store owner's conduct was merely passive,[11] we explained that Section 315–and not the ordinary duty of reasonable care-applied in that case.[12] *Id.* at 556, 727 A.2d at 952–53.

Most recently, just last year, the Court addressed Section 315 in *Barclay v. Briscoe*, 427 Md. 270, 47 A.3d 560 (2012).[13]

---

**11.** Illustrating the Court's awareness of the difference between active and passive risk creation in this context, the Court distinguished the facts in *Valentine* from a Texas case, which did find a duty of care because there "the guard's pursuit of the armed shoplifter increased the danger to plaintiff's decedent and others present in the store, thereby partially creating the danger to which they were exposed." *Valentine v. On Target, Inc.,* 353 Md. 544, 554, 727 A.2d 947, 952 (1999) (citing *Berly v. D & L Sec. Servs. & Investigations, Inc.,* 876 S.W.2d, 179 (Tex.Ct.App.1994)).

**12.** We stated:
> Extending **the general duty that an actor owes to exercise reasonable care to avoid causing injury to another** and applying it to the facts of this case would require that this Court create a completely new cause of action. . . . We caution that the holding in this case does not mean that a **gun store owner** may never be held **liable to another party for negligence** in the display and sale of guns when that other party is injured as a result of the negligence but rather that under the specific facts alleged in this particular case no duty was owed to this petitioner's decedent. (Emphasis added).

*Id.* at 556, 727 A.2d at 952–53.

**13.** The Court also considered Section 315 in *Williams v. Mayor of Baltimore,* 359 Md. 101, 753 A.2d 41 (2000). The issue in *Williams* was whether an officer's specific promises of protection could create a special relationship sufficient to impose a tort duty of protection on the part of the officer. *Id.* at 108, 753 A.2d at 44. Applying the rule of Section 315, the Court held that a special relationship may have been formed, stating: "While the officer may have had no duty to remain, if

The issue in *Barclay* was whether "employers owe a duty to the motoring public to ensure that an employee not drive home when an extended work schedule caused sleep deprivation." *Id.* at 279, 47 A.3d at 565. In that case, under a collective bargaining agreement, "a longshoreman could accept or decline a shift, and those who accepted could stay on for as many consecutive shifts as desired." *Id.* at 275, 47 A.3d at 562–63. A longshoreman accepted a work shift and chose to work for twenty-two hours. *Id.* at 274–75, 47 A.3d at 562–63. After he left work that day, he fell asleep at the wheel and caused an accident, killing himself and severely injuring another motorist. *Id.*

The Court applied the rule from Section 315, and held that there was no special relationship between the employer and the injured party. *Id.* at 295, 47 A.3d at 575. This holding reflected the Court's awareness of the distinction between active and passive risk creation:

> Thus, we conclude, in light of Maryland precedent, as augmented by persuasive authority, **that an affirmative act of control by the employer** *following* **and prompted** by the employee's incapacity **must be present in order for a duty to arise,** and we decline "to create a duty where an employer's only affirmative act of control *preceded* the employee's shift and incapacity and amounted only to establishing work conditions that may have caused or contributed to the accident." (Emphasis in bold added) (citation omitted).

*Id.* at 306, 47 A.2d at 582. Indeed, the Court explained this holding by looking to a similar Texas case: "Rather, the

in fact he told Mrs. Williams that he would remain to protect them, he may have created a special relationship further creating a duty either to remain or to inform them that he was leaving." *Id.* at 150–51, 753 A.2d at 68.

Thus, in *Williams* the officer generally would not have owed a duty because, at all times, the officer was merely passive—i.e. his failure to protect the victims from harm—and did not actively contribute to the harm suffered by the plaintiff. But, under the facts of that case, the rule of Section 315 may still hold the officer liable because a special relationship could have been formed.

[Texas Supreme Court] said that, 'simply knowing that an employee is intoxicated or incapacitated is not enough for a duty to arise. Rather, the employer must *affirmatively* exercise control of the incapacitated employee.'" *Id.* at 305, 47 A.3d at 581 (emphasis in original) (quoting *Nabors Drilling, U.S.A., Inc. v. Escoto,* 288 S.W.3d 401, 407 (Tex.2009)).

With this, I agree. No duty will lie if an employer simply knows that an employee is tired, or if a bar simply knows that a patron is drunk. The alleged duty does not attach until the bar serves an alcoholic drink **following** the visible intoxication. In this case, the Warrs did not allege that the bar was negligent for simply knowing that Eaton was drunk and letting him leave. The Warrs alleged that the bar was negligent because—after facilitating Eaton to become visibly intoxicated—it continued to serve him alcohol nonetheless. Thus, unlike the employer in *Barclay,* the bar affirmatively acted following the incapacity. This differs from *Barclay* in which the employer "did nothing to affirmatively control whether [the employee] drove home in a fatigued state." [14] *Id.* at 306, 47 A.3d at 582.

The Court in *Barclay* also recognized that its holding reflected the absence of any public policy on the issue of fatigued employees in Maryland and declined to "use this case to fashion some type of judicially-imposed maximum working hours standard across all industries." *Id.* at 307, 47 A.3d at 582. Unlike the serving of alcohol to visibly intoxicated persons, Maryland has no law or regulation forbidding an

---

**14.** For additional Maryland cases applying the rule of Section 315 to situations where the defendant passively failed to act, see *Remsburg v. Montgomery,* 376 Md. 568, 590, 599, 831 A.2d 18, 31, 36 (2003) (applying Section 315 to hold that no duty was imposed on the organizer of a hunting party for passively failing to prevent a member of the party from acting negligently); *Muthukumarana v. Montgomery Cnty.,* 370 Md. 447, 486, 496, 805 A.2d 372, 395, 401 (2002) (applying Section 315 to hold that no duty was imposed on 911 operators for passively failing to prevent the harm suffered by the victim); *Ashburn v. Anne Arundel County,* 306 Md. 617, 630–31 & n. 2, 510 A.2d 1078, 1085 & n. 2 (1986) (applying Section 315 to hold that no duty was imposed on a police officer for passively failing to detain a drunk driver).

employer from allowing an employee to work multiple shifts. As I discuss later, however, criminal statutes forbid a bar from serving alcohol to a visibly intoxicated individual and forbid an intoxicated individual from driving.

What can be summarized from the case law discussing Section 315 is that, until the Majority's opinion today, Maryland's precedent had been consistent with the explanation of Section 315 of the Second Restatement set out above. That is, the rule of Section 315, which requires a special relationship, applies only when the defendant's conduct is passive, i.e. he fails to act. Before today, this Court has never applied Section 315 to relieve a defendant from liability when the defendant's own affirmative acts increased the risk of foreseeable harm to another.

*Active vs. Passive Distinction in the Major Tort Treatises*

As I have demonstrated, contrary to the assertion of the Majority, Section 315, as it was contemplated by the Restatement and implemented by this Court, does not apply to cases in which the defendant's (the bar's) own affirmative conduct creates a risk of harm to another (the Warrs).[15] Moreover,

---

**15.** Illustrating the Majority's carelessness, is the Majority's reliance on several Section 315 cases—such as *Barclay, Ashburn,* and *Remsburg*— as well as *Gourdine v. Crews,* 405 Md. 722, 955 A.2d 769 (2008). *Gourdine* is an ordinary duty of care case that did not address Section 315. Indeed, the Court in *Gourdine* specifically stated: "Special relationship, nevertheless, is not an issue in the present case." 405 Md. at 746 n. 12, 955 A.2d at 784 n. 12. Yet, the Majority suggests that our holding in *Gourdine* was based on the fact that the plaintiff "had not alleged any special relationship." Maj. Op. at 188, 70 A.3d at 358.

Such a mischaracterization misrepresents our holding in *Gourdine* and demonstrates the Majority's failure to recognize the differences between the ordinary duty of care and the rule of Section 315. Indeed, the Majority fails to provide any citation to *Gourdine* where this Court stated that a special relationship was required in order to find a duty. Indeed, it could not, because the Court never discussed special relationship. Instead, in *Gourdine* we held that there was no duty because the connection between the pharmaceutical company's specific failure to give a warning and the specific victim's injury was too attenuated. 405 Md. at 750, 955 A.2d at 786. This discussion of a connection between the parties was not a discussion of a special relationship. It was a discussion of "the closeness of the connection between the defendant's

not only do the Restatement and this Court's case law fail to support the Majority's opinion, but the Majority gains no succor in any of the major treatises on this topic. As I have already explained, Prosser and Keeton clearly envision that the ordinary duty of care applies to individuals who actively create a risk of harm to others, and the rule of Section 315 applies to individuals who are merely passive observants, playing no role in the harm suffered by the plaintiff. This distinction between the active creation of risk and mere passive observance is also recognized by the major tort treatises.

Dobbs, for example, in his treatise *The Law of Torts*,[16] begins his section on Duty—entitled "The general rules of duty"—by setting forth the fundamental principles on which I rely:

> Where the defendant does not create or continue a risk of harm, the general rule, subject to certain qualifications, is that he does not owe an affirmative duty to protect, aid, or rescue the plaintiff.

> On the other hand, where the defendant by some action on his part, creates, maintains, or continues a risk of physical harm, the general standard or duty is the duty of reasonable care, that is, the duty to avoid negligent conduct. Thus a duty of care is ordinarily owed to avoid conduct that creates risks of harms to others. This is the approach of the cases and the understanding of major commentators and the Restatement Third of Torts. (Footnotes omitted).

---

conduct and the injury suffered" which—as I will explain later—is a factor to be considered under the ordinary duty of care analysis. Here, the Majority confuses the "closeness of the parties" factor of ordinary duty of care with the "special relationship" determination of Section 315. Moreover, in *Gourdine*, the Court specifically acknowledged that "foreseeability alone may give rise to liability to a third party." *Id.* at 754, 955 A.2d at 789. This contradicts the Majority's approach today, which states that special relationship, not foreseeability, controls the determination of duty in cases involving conduct of third persons.

**16.** Dobbs's treatise *The Law of Torts*, published for the first time in 2001, is the successor to *Prosser and Keeton on the Law of Torts*.

2 Dan B. Dobbs, et al., *The Law of Torts* § 251, at 2–4 (2d ed.2011). Dobbs then elaborates on the ordinary duty of care, explaining that, "The general duty of reasonable care arises when the harm complained of is physical harm to person or property and the parties are strangers, that is, when the parties are not in a special relationship that calls for a different duty standard." *Id.* at § 254, at 12. To the contrary, "When the ... parties are in a special relationship ...", courts may prescribe or recognize different obligations." *Id.*

Driving home the point that Section 315 does not apply in cases of active risk creation, Dobbs states that, "the rule of non-liability for failure to control third persons does not shield the defendant from liability for his negligence [when] Courts perceive the defendant's conduct as actively creating an unreasonable risk of injury from such third persons." *Id.* at § 413, at 699–700. As Dobbs explains, the reason why the ordinary duty of care, and not the rule of Section 315, applies to individuals who actively create a risk of harm is because, **"The defendant in these cases is not being required to control others or even to protect them from attacks. On the contrary, he is being required only to take no active steps in creating risks of danger from third persons. In such cases, the no-duty-to-control rule does not protect the defendant."** *Id.* at § 414, at 702–03 (emphasis added).

Likewise, this view is also shared by Oscar Gray in his treatise *Harper, James and Gray on Torts.* As Gray explains, at one end of the duty spectrum are cases in which individuals actively create a risk of harm. Explaining the duty applicable in these cases, Gray states that, "people owe a duty to use care in connection with their affirmative conduct, and they owe it to all who may foreseeably be injured if that conduct is negligently carried out." 3 Oscar S. Gray, *Harper, James & Gray on Torts* § 18.6, at 862 (3d ed.2007). Gray continues: "At the other end of the spectrum are cases where the peril to the plaintiff has come from a source in no way connected with the defendant's conduct or enterprises or undertakings, past or present, but where the defendant has it in his power by taking some reasonable precaution to remove

the peril." *Id.* at § 18.6, at 874. In these cases, the rule of Section 315 would apply, and as Gray phrases it, "the law has traditionally been said to find no duty." *Id.* But Gray clearly recognizes that the rule of Section 315 does not mean that liability for third party conduct is always foreclosed. He explains that, "[t]he distinction between affirmative conduct and the mere omission to act comes into play in deciding whether an actor has the duty to control the conduct of others." *Id.* at § 18.7, at 899.

Thus, the major legal commentators on the law of torts—including the Restatement Second; the Restatement Third; Prosser and Keeton; Dobbs; and Harper, James and Gray—all support my understanding that the ordinary duty of care governs individuals who actively create a risk of harm to others, and the rule of Section 315 governs individuals who are merely passive observants, playing no role in the harm suffered by the plaintiff.

### *This Court Has Applied the Ordinary Duty of Care to Conduct of Third Persons*

Indeed, further contradicting the Majority's use of the special relationship test in this case, this Court has applied the ordinary duty of reasonable care, in several different instances, to hold a defendant liable, for negligence, to members of the general public based on harm caused by a third person. The tort of negligent entrustment is a particularly apt illustration.[17]

The most common example of negligent entrustment occurs when the owner of an automobile loans a car to a third person who the owner knows, or should know, was likely to use the car in a manner involving an unreasonable risk of physical harm to others. *See* Restatement (Second) of Torts § 390

---

17. "As numerous courts have pointed out, there is an obvious analogy between the negligent sale of alcohol to a visibly intoxicated person and the tort of negligent entrustment." *Buchanan v. Merger Enterprises, Inc.,* 463 So.2d 121, 126 (Ala.1984).

(1965).[18]  The third person then causes an accident, injuring some member of the general public.  In such cases, we routinely hold the owner liable to the injured member of the public for the harm caused by the third person based on the owner's primary negligence in entrusting the car to the third person.  This is because the owner of a car has a duty to exercise due care to avoid unreasonable risks of harm to others.  And, because the owner knew or should have known that the third person was likely to use the car in a manner involving an unreasonable risk of physical harm to others, the owner has failed to exercise the necessary due care.  The owner, therefore, is held liable to a member of the general public for the harm of a third person based "upon [the owner's] primary negligence . . . in permitting [the third person] . . . to be in possession of and operate the [car], *Rounds v. Phillips*, 166 Md. 151, 160, 170 A. 532, 535 (1934), because the owner had the power to permit and prohibit the use of the entrusted [car]." *Broadwater v. Dorsey,* 344 Md. 548, 559, 688 A.2d 436, 441 (1997).

Likewise, in the tort of negligent hiring we also hold defendants liable for negligence to members of the general public for harm caused by a third person.  This is because an employer owes a duty of reasonable care to select fit employees who will not cause an unreasonable risk of harm to others.  Explaining this duty, this Court has specifically stated:  "The class of persons intended to be protected by the imposition of this duty necessarily includes those **members of the public** who would reasonably be expected to come into contact with

---

**18.**  This Court has adopted the doctrine of negligent entrustment from Section 390 of the Second Restatement of Torts, which provides:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Restatement (Second) of Torts § 390 (1965);  *see Broadwater v. Dorsey,* 344 Md. 548, 554, 688 A.2d 436, 439 (1997) (and cases cited therein).

[the employee]. That such persons could not be identified in advance does not mean that they are not included in the class." *Henley v. Prince George's Cnty.*, 305 Md. 320, 336, 503 A.2d 1333, 1341 (1986) (emphasis added); *see also Evans v. Morsell*, 284 Md. 160, 164, 395 A.2d 480, 483 (1978) ("Long ago this Court recognized, ... that in hiring and retaining someone, an employer owes a duty to his other employees and to the general public to use reasonable care.").

In *Henley v. Prince George's County*, for example, a building contractor hired a former convict as a carpenter instructor, but subsequently entrusted the former convict to perform security and caretaking functions as well. 305 Md. at 324–25, 503 A.2d at 1335–36. The contractor knew that the convict had been convicted of second degree murder and had made comments that, if he caught the person vandalizing the property, he would rape and kill him. *Id.* Still, the contractor kept the former convict in his security position. *Id.* at 327, 503 A.2d at 1336. The former convict then did just what he promised to do: he raped and killed a suspected vandal. *Id.* The Court stated that the building contractor could owe a duty to the suspected vandal because "[t]he class of persons intended to be protected by the imposition of this duty necessarily includes those members of the public who would reasonably be expected to come into contact with [the former convict] in his performance of security duties." *Id.* at 336, 503 A.2d at 1341. In this regard, "[i]t is at least a permissible conclusion that a suspected vandal would be within the class of persons subjected to an increased risk of harm by the negligent assignment of security duties to [the former convict], and thus the test of foreseeability may be met...." *Id.* at 337, 503 A.2d at 1342. Thus, an employer can be liable to a member of the general public for harm caused by a third person.

### The Role of Foreseeability In Limiting the Ordinary Duty of Care

As these examples clearly illustrate, contrary to the Majority opinion, this Court has imposed the ordinary duty of reasonable care on a defendant, as to members of the public

who are harmed by the conduct of a third person, without requiring the plaintiff to prove a special relationship under Section 315.[19] In so doing, this Court has recognized the problems with potentially unlimited liability to any member of the public, and therefore, has fashioned its case law around limiting the ordinary duty to avoid unreasonable risk of harm to others, not rejecting it wholesale: "We have also recognized that the concept of duty as owing to all persons the exercise of reasonable care to protect them from harm has to be limited if liability for unreasonably remote consequences are to be avoided." *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 148, 642 A.2d 219, 226 (1994). In this regard, "[o]ne of the mechanisms that has been utilized to accomplish that limitation is, and has been, application of the variable, foreseeability, to the determination of whether a duty exists." *Id.* at 148–49, 642 A.2d at 226. In other words, we have limited the duty so that an individual does not owe a duty of care to every member of the general public who is harmed by a third person, but only to those who could be foreseeably harmed by his conduct. *See, e.g., Henley,* 305 Md. at 336, 503 A.2d at 1341 ("The class of persons intended to be protected by the imposition of this **duty** necessarily includes those **members of the public** who would reasonably be expected to come into contact with Wantland in his performance of security duties." (emphasis added)).

The use of foreseeability to limit the ordinary duty to exercise reasonable care contradicts the Majority's interpretation that the ordinary duty of care only applies in cases where the plaintiff and defendant have a direct one-on-one relationship. Certainly there are at least some situations in which it is foreseeable that a defendant's affirmative conduct will cause a third person to harm the plaintiff. *See Gourdine v. Crews,* 405 Md. 722, 754, 955 A.2d 769, 789 (2008) ("Therefore,

---

**19.** Although these cases are distinguishable from the present one, I cite them to show the fundamental error in the Majority's holding that a defendant in a negligence action can only owe a duty of care to a member of the public who is harmed by a third person if a special relationship exists.

although there may be circumstances where **foreseeability alone may give rise to liability to a third party** because of policy reasons, this is not the case." (emphasis added)). And, when these situations do arise, the ordinary duty to exercise reasonable care may be imposed on the defendant based on the defendant's own active creation of risk.

### Ordinary Duty of Care Imposed on Dram Shop's Active Risk Creation

To determine in which cases the ordinary duty will lie, this Court is required to examine several factors. In this group, foreseeability has often been described as the most important factor, but it is not the only one, and the factors we consider in determining the existence of a duty ordinarily include:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Remsburg v. Montgomery*, 376 Md. 568, 583, 831 A.2d 18, 26 (2003) (citation omitted). The Majority, although it cites these factors, fails to provide any in-depth analysis of them. I endeavor to examine each of the necessary factors in the context of this case.

### Foreseeability

To determine whether a common law duty should be imposed on the bar, I begin with the factor that is often considered the most important in the duty calculus: "the foreseeability of harm to the plaintiff." In determining when the harm must have been foreseeable, this Court has explained: "Foreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct."

*Henley,* 305 Md. at 336, 503 A.2d at 1341. In this case, then, the question is whether it was foreseeable by the tavern, at the time of continuing to serve alcohol to Eaton after he was already "visibly under the influence," that Eaton might get behind the wheel of a car, cause an accident, and kill or seriously injure someone.

Most people know that the "[o]ver-consumption of alcohol is linked to serious alcohol-related problems, including traffic crashes and fatalities. . . ." Nat'l Highway Traffic Safety Admin, at 11. In Maryland alone, over 24,000 people are arrested every year for driving under the influence of alcohol. *See* Task Force, *Findings and Recommendations,* at 1–2. Drunk drivers account for approximately forty percent of all traffic related accidents in this State. *Id.* On average, this accounts for 4,899 accidents every year. *Id.* Sadly, these accidents often result in the predictable outcome—death: "In Maryland, an average of **220 people died annually** as a result of impaired-driving-related crashes on Maryland roads between 2004 and 2007. This equates to **18 deaths a month** or **a death every 40 hours.** . . ." *Id.* (emphasis added).

This unfathomable number of deaths is in no small part related to commercial vendors of alcohol. As the United States Department of Transportation explained: "Studies . . . show that up to 50 percent of people driving under the influence had their last drinks at licensed establishments. . . ." Nat'l Highway Traffic Safety Admin., at 2. As another study put it: "Roadside surveys disclosed that the leading source of intoxicated drivers . . . has been licensed on-sale establishments, such as bars and restaurants." McKnight, at 79.

In the face of these statistics, and based on common knowledge, it was clearly foreseeable by the bar, that if it continued to serve a patron who was already "visibly under the influence" of alcohol, the patron may drink and drive, violate the rules of the road, and cause an accident. To say that the bar could not reasonably foresee the possibility of Eaton driving a car would be misguided.[20]

*Policy of Preventing Future Harm*

In addition to the foreseeability analysis, this Court also considers whether imposing a duty would create a "policy of preventing future harm." Discussing this factor, this Court has looked to the following explanation offered by Prosser and Keeton:

> The "prophylactic" factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with the compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive.... While the idea of prevention is seldom controlling, it very often has weight as a reason for holding the defendant responsible.

Keeton, § 5, at 25–26; *see also Matthews v. Amberwood Assocs. Ltd. P'ship*, 351 Md. 544, 570, 719 A.2d 119, 132 (1998), *modified, Tracey v. Solesky*, 427 Md. 627, 50 A.3d 1075 (2012).

Regarding the danger created by people like Eaton, the General Assembly has sought to prevent both over-intoxi-

---

**20.** The Majority claims that it was not foreseeable because it was "not an absolute" that Eaton would drive upon leaving the bar. *See* Maj. Op. at 182–83, 70 A.3d at 354–55. Certainly not every patron who leaves a bar will drive, but that does not make it any less foreseeable that there will be visibly intoxicated patrons who do drive. For the Majority to hold that it is not foreseeable that people will become intoxicated at a bar and then drive home is to ignore the truth of modern society.

As one court explained:

> Any reasonable person would foresee that an intoxicated person will act with a lack of prudence, control, and self-restraint. With travel by automobile both commonplace and necessary in today's society, no one may justifiably claim ignorance of the danger posed by one whose abilities and judgment are impaired by alcohol. The harm is both likely and foreseeable, and the societal cost of alcohol-related injuries is enormous.

*Largo Corp. v. Crespin*, 727 P.2d 1098, 1102 (Colo.1986).

cation and drunk driving. The Legislature has committed an entire Article of the Code to the regulation of alcoholic beverages, stating: "It is the policy of the State of Maryland that it is necessary to regulate and control the manufacture, sale, distribution, transportation and storage of alcoholic beverages within this State ... to obtain respect and obedience to law and to foster and promote temperance." Md.Code (1957, 2011 Repl.Vol.), Article 2B, § 1–101(a)(1). In so doing, the Legislature further declared that "[t]he restrictions, regulations, provisions and penalties contained in this article are for the protection, health, welfare and safety of the people of this State." *Id.* § 1–101(a)(3).

To this end, the General Assembly has envisioned that commercial vendors of alcohol will play a role in protecting the public from over-intoxication and drunk driving. The Legislature made it a criminal offense for a bar "licensed under this article, or any employee of the [bar to] sell or furnish any alcoholic beverages at any time ... [t]o any person who, at the time of the sale, or delivery, is **visibly under the influence** of any alcoholic beverage." *Id.* § 12–108(a)(1)(ii) (emphasis added). The Legislature then required these commercial vendors to attend and be trained by alcohol awareness programs. *Id.* § 13–101. Specifically, this mandatory training provided to the bar (1) "includes instruction on how alcohol affects a person's ... [b]ody; and ... [b]ehavior;" (2) "provides education on the dangers of drinking and driving; and" (3) teaches "effective methods for ... [s]erving customers to minimize the chance of intoxication; ... [c]easing service before the customer becomes intoxicated; and ... [d]etermining if a customer is under the drinking age." *Id.* § 13–101(a)(2)–(4).[21]

The General Assembly has also sought other ways to rid this State of its drunk drivers. As this Court has previously explained, "[t]he General Assembly's goal in enacting the

---

21. Commercial vendors in Montgomery County are required to be retrained by an alcohol awareness program every four years. Md.Code (1957, 2011 Repl.Vol.), Article 2B, § 13–101(c)(1)–(2).

drunk driving laws . . . is to meet the considerable challenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace." *Motor Vehicle Admin. v. Richards,* 356 Md. 356, 372–73, 739 A.2d 58, 67–68 (1999) (alterations in original) (citation and quotation marks omitted). These "statutory provisions were enacted for the protection of the public and not primarily for the protection of the accused." *Id.* at 373, 739 A.2d at 68 (citation and quotation marks omitted). Yet, as the statistics illustrate, the Legislature's efforts have not been successful.

Under these circumstances, it is appropriate, and, I submit, wise, to invoke a common law remedy to help in solving the problem. A main goal of tort law is to deter future negligent conduct, which is accomplished by providing tortfeasors with proper incentives that will create a policy of preventing future harm.[22] Imposing civil dram shop liability would do just that: it would create stronger incentives for the bar owners to abide by the existing requirement that they avoid serving patrons that are already "visibly under the influence" of alcohol. *See* Art. 2B, § 12–108(a)(1)(ii) (making it a criminal offense for a bar to "sell or furnish any alcoholic beverages at any time . . . [t]o any person who, at the time of the sale, or delivery, is visibly under the influence of any alcoholic beverage"). This "can foster an environment that encourages responsible server behavior, and thus encourages investment in server training and other primary prevention strategies [and] can also help to create a retail environment that makes responsible beverage service the norm." Rammohan, at 340.

---

**22.** *See* 1 Dan B. Dobbs et al., *The Law of Torts* § 14, at 29 (2d ed. 2011) ("Courts and writers almost always recognize that another aim of tort law is to deter certain kinds of conduct by imposing liability when that conduct causes harm."); *see also* Jeffrey S. Quinn, Comment, *Does Mass Product Tort Litigation Facilitate or Hinder Social Legislative Reform? A Comparative Study of Tobacco Regulation,* 9 Rutgers J.L. & Pub. Pol'y 106, 169–70 (2012) ("The deterrent theory of tort law is rather simple: tort law threatens people with having to pay for the injuries they produce; therefore, people will alter their behavior by taking into account the interests of others in a socially desirable and less injury-producing way.").

Indeed, scientific "studies of dram shop liability [have] consistently found that this intervention reduced motor vehicle crash deaths in general and alcohol-related crash deaths in particular. Strong evidence indicated that dram shop liability is an effective intervention for reducing alcohol-related harms, as indicated by reduced motor vehicle crashes." *Id.*

The current statutory scheme jumps from the regulation and licensing of bars straight to criminal responsibility. Imposing a common law duty on commercial vendors not to serve alcohol to a patron, who is already "visibly under the influence," creates effective incentives, which would enhance the statutory scheme already in place to deter misconduct by the tavern and prevent future harm.[23] *See Eisel v. Bd. of Educ. of Montgomery Cnty.*, 324 Md. 376, 389, 597 A.2d 447, 454 (1991) ("[H]olding [school] counselors to a common law duty of reasonable care to prevent suicides when they have evidence of a suicidal intent comports with the policy underlying this Act.").

### Closeness of the Parties

The next factor to consider, in determining whether there is a duty, is the closeness of the parties. Similar to the foreseeability analysis, this factor takes into account "the closeness of the connection between the defendant's conduct and the injury suffered." In this regard, this Court has stated:

an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury.

---

23. This discussion brings to mind the counter-argument that if the public policy sketched out by the Legislature so clearly calls for the imposition of dram shop liability, then why has the General Assembly itself not enacted dram shop liability. I address this argument later, and explain why legislative inaction in this case does not inhibit this Court's duty and responsibility to properly determine the common law of Maryland.

*Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 537, 515 A.2d 756, 761 (1986). Thus, this standard involves a spectrum by which courts should determine whether to impose a duty of care. The more severe the injury, the more remote the parties may be.

Here, the harm is as severe as possible. It very often involves death or permanent serious injury. In this case, a ten-year old girl was killed, and her thirteen-year old sister and both grandparents suffered serious injuries. Furthermore, not only is the type of harm severe, but it is frequent. *See* Task Force, *Findings and Recommendations,* at 1–2. Thus, the magnitude of the harm moves this case across the spectrum and justifies imposition of a duty in favor of a large class of individuals, including the Warrs in this case.

### Moral Blame

In determining the existence of a duty, this Court also looks at "the moral blame attached to the defendant's conduct." Under this factor, an intent to cause harm is not necessary. *Eisel,* 324 Md. at 390–91, 597 A.2d at 455. Rather, "the reaction of persons in general to the circumstances" is important. The question is whether it is "the sense of the community that an obligation exists under the circumstances." *Id.* In this case, I would answer yes. The majority of the general public would be outraged at a commercial vendor who, for the sake of profit, continues to serve an already drunk person well past the line of being "visibly under the influence," to the point of becoming aggressive and violent, and then sends him on his way, where he gets behind the wheel of a vehicle and kills a ten-year-old girl. By the standards of our community, this is morally blameworthy. *See* Art. 2B, § 12–108(a)(1)(ii) (making the conduct of the bar punishable by criminal penalties); *see also* Nat'l Highway Traffic Safety Admin., at 7 ("Criminal liability suggests moral approbation. . . .").

### Burden on Commercial Vendors of Alcohol

Before this Court will impose a duty, however, we also examine "the extent of the burden to the defendant." In this

case, establishing a common law duty not to serve alcohol to a person who is "visibly under the influence" does not impose any new or additional burden on the bar owners. This burden already exists, and was imposed on the tavern by the General Assembly—violation of which exposes the tavern to criminal prosecution. *See* Art. 2B, § 12–108(a)(1)(ii). And, if a bar is already complying with the burden established under the criminal law, then this declaration of a parallel common law duty is not unduly burdensome.

Moreover, when the death of a Maryland citizen every forty hours is compared against ensuring that a person "visibly under the influence" of alcohol is not served further alcoholic drinks, the scales tip overwhelmingly in favor of imposing a duty on the bar establishments. *See* Task Force, *Finding and Recommendations,* at 1–2.

### Conclusion: A Duty Exists

Examining the sum of all the factors, I would hold that the common law of Maryland imposes an ordinary duty of reasonable care on a commercial vendor of alcohol not to continue to serve alcohol to any person "visibly under the influence" of alcohol. It is reasonably foreseeable that a patron visibly under the influence of alcohol may drink and drive and cause a serious accident due to the effects of alcohol. Recognizing a duty augments the current legislative scheme and provides greater incentives for tavern owners to adopt procedures designed to prevent future harm. The nexus between the parties here is sufficiently close given the enormous magnitude of the harm caused by the over-intoxication of Eaton. The conduct of a tavern in selling to visibly intoxicated persons is morally blameworthy and imposing this duty simply invokes a common-law remedy to increase compliance with existing obligations of the tavern.

Let me stress the limits of the duty which I would impose: it involves only the service of alcohol by a commercial vendor **after** a patron is "visibly under the influence" of alcohol. There would be no breach of duty in serving the customer before visible intoxication, and none in serving the drink that

pushes a patron over the line from not visibly intoxicated to visibly intoxicated. As a Texas court explained this limitation, "the duty to discontinue serving alcohol arises once, through the observation of a patron's demeanor, conduct or appearance, [the bar] knows or should know the patron is intoxicated." *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987). A West Virginia court offered more detailed guidance, explaining that

> the seller or its agents must be capable of knowing that the buyer is drunk. The standard is that the buyer exhibited some physical sign of drunkenness, such that reasonably prudent serving personnel could have known that the buyer was drunk. The most obvious case is physical staggering. Slurring of words, loud or inappropriate speech, bleary eyes, shaky hands, and general slovenliness are other signs a server should look for. The sheer amount of alcohol a patron has been served may make it apparent to the server that the drinker has had too much. Thus, there would be no liability for serving one drink to a drunk person who displays no signs of drunkenness. . . .

*Bailey v. Black,* 183 W.Va. 74, 394 S.E.2d 58, 60 (1990). Thus, in order to prevail, a plaintiff (the Warrs) would bear the burden of proving, by a preponderance of the evidence, that the intoxicated patron (Eaton) was served by a commercial vendor (JMGM) after the vendor knew or should have known that the patron was "visibly under the influence" of alcohol.[24]

---

**24.** The Majority claims that the duty of care I advocate for here cannot be limited to commercial vendors of alcohol and would necessarily be expanded to include all social hosts such as church groups and charitable organizations. This is not true. Yes, the argument can be made that it is just as foreseeable for an intoxicated person to leave a social host and drive as it is for an intoxicated person to leave a tavern and drive. Yet, I do not base this duty of care solely on foreseeability. As I have explained, I am willing to impose this duty of care on commercial vendors of alcohol based on the sum of all the relevant factors in the duty calculus. In this regard, there are differences in the other factors that could produce a different outcome regarding social host liability. The most obvious of these is the complete lack of any indication from the General Assembly that social hosts are to play a role in limiting this State's drinking and driving problem. The legislature has made it a

## Proximate Cause

After duty, comes proximate cause. I would also hold that the serving of alcohol by the bar (JMGM) can be the proximate cause of injuries suffered by a third person (the Warrs)

criminal offence for a bar to serve a person who is "visibly under the influence" of alcohol. It is not a crime for a social host to do this. Commercial vendors of alcohol must go through specific training in serving alcohol and observing its affects on the drinker. Social hosts do not have to do this. In this State, then, there may not be a policy of preventing future harm caused by social hosts, the conduct of social hosts may not be considered morally blameworthy in the community, and imposing a new duty on social hosts may create too large of a burden. These are factors that would need to be evaluated in the specific context of social host liability—with which we are not concerned here.

Similarly, the duty I advocate for here should not be read to support a cause of action on behalf of the visibly intoxicated patron as against the tavern. I see this duty arising from the sum of all the factors in the duty calculus, and that sum is undoubtedly different when those factors are examined in the context of deciding whether a duty is owed to the visibly intoxicated patron. In part, my analysis of these factors has been informed by legislative enactments. The General Assembly has very clearly found that both commercial vendors of alcohol and drunk drivers are part of the problem currently facing this State. The legislature has passed a series of laws targeted at preventing bars from serving visibly intoxicated patrons and at stopping intoxicated patrons from driving. In this regard, both the General Assembly and this Court have been consistent in explaining that the purpose behind these laws is to protect the public, and they are not designed to protect the intoxicated driver. *See, e.g.,* Md.Code (1957, 2011 Repl.Vol.), Article 2B, § 1–101(a)(3) ("The restrictions, regulations, provisions and penalties contained in this article are for the protection, health, welfare and safety of the people of this State."); *Motor Vehicle Admin.v. Shrader,* 324 Md. 454, 464, 597 A.2d 939, 943 (1991) (in rejecting driver's effort to invoke statute for his benefit, Court said: "We have consistently recognized that the statutory provisions enacted to enforce the State's fight against drunken driving ... were enacted for the protection of the public and not primarily for the protection of the accused."). Thus, although there is a clear policy in this State to prevent future harm caused by drunk drivers, that policy was never designed to protect the intoxicated driver. Indeed, keeping in mind that a goal of tort theory is to create proper incentives to alter injurious behavior, Dobbs, § 14, at 29, it would be perverse to claim that we are preventing future harm caused by drunk drivers but simultaneously rewarding drunk drivers with a cause of action arising from their drunkenness. Our societal sense of personal responsibility forecloses any such result. In contrast, I urge that we impose a duty in this case because the bar's conduct, in comparison to the innocent third party victim, is morally blameworthy.

based on the tortious acts of an intoxicated customer (Eaton). The doctrine of stare decisis does not counsel otherwise.

## *Stare Decisis Does Not Prevent Changing the Rule*

Unlike the duty of care issue, this Court does have precedent regarding the proximate cause issue—*Hatfield* and *Felder*. Under such circumstances, we generally adhere to principles of stare decisis, which "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Livesay v. Balt. Cnty.*, 384 Md. 1, 14, 862 A.2d 33, 40–41 (2004) (citation and quotation marks omitted). Yet, this Court will alter its common law precedent when the prior decision was "clearly wrong and contrary to established principles," or "when there is a showing that the precedent has been superseded by significant changes in the law or facts." *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 64, 5 A.3d 45, 55–56 (2010) (citations and quotation marks omitted). Such changes may occur when, for example, "we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." [25] *Harrison v. Montgomery Cnty. Bd. of Educ.*, 295 Md. 442, 459, 456 A.2d 894, 903 (1983). I believe such is the case here.

---

**25.** For examples of cases where we changed the common law, see *Tracey v. Solesky*, 427 Md. 627, 50 A.3d 1075 (2012) (holding owners of pit bulls strictly liable for dog bites); *Bozman v. Bozman*, 376 Md. 461, 830 A.2d 450 (2003) (completely abrogating doctrine of interspousal immunity); *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983) (abrogating doctrine of interspousal immunity in negligence claims); *Moxley v. Acker*, 294 Md. 47, 447 A.2d 857 (1982) (permitting action of forcible detainer even when force is not present); *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981) (recognizing tort of abusive or wrongful discharge); *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77 (1978) (abrogating doctrine of interspousal immunity for intentional torts); *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977) (recognizing tort of intentional infliction of emotional distress).

## Change in the Facts

*Hatfield* drew upon a long-standing rule, created in the 1800s, that there is "no right of action against a seller of intoxicating liquors, as such, for 'causing' intoxication of the person whose negligent or wilful wrong has caused injury." [26] 197 Md. at 254, 78 A.2d at 756. At that time, the law did not recognize a "relation of proximate cause between a sale of liquor and a tort committed by a buyer who has drunk the liquor." *Id.*

In the 1800s, however, most people would either walk or ride in horse-drawn carriages. At the time the common law rule was developed, the modern automobile had not even been invented, and therefore, the selling of alcohol to a visibly intoxicated person would not have created an unreasonable risk of harm to others through the operation of a motor vehicle. Today, however, people rely substantially on an automobile when they travel outside their immediate neighborhoods. Indeed, many bars provide its patrons with a parking lot or accessible parking nearby.[27]

The significance of this change in our society is obvious and profound. Automobile accidents are one of the leading causes of death in our country, and the addition of alcohol only makes

---

**26.** In reaching this conclusion, *Hatfield* relied upon an 1882 case *Dunlap v. Wagner,* 85 Ind. 529 (1882). *Hatfield* also cited several product liability cases from the 19th century and early 20th century, including *Thomas v. Winchester,* 6 N.Y. 397 (1852) and *Flaccomio v. Eysink,* 129 Md. 367, 100 A. 510 (1916), as well as, some English cases of the same vintage. *Hatfield* concluded that, "Under the common law it is not an actionable wrong either to sell or to give intoxicating liquors to an able-bodied man." *State v. Hatfield,* 197 Md. 249, 255, 78 A.2d 754, 757 (1951) (citation and quotation marks omitted).

**27.** For examples of courts which also discussed these factual differences between life in the 1800s and modern society when recognizing a cause of action for dram shop liability, see *Buchanan,* 463 So.2d at 125; *Shannon v. Wilson,* 329 Ark. 143, 947 S.W.2d 349, 352 (1997); *Grayson Fraternal Order of Eagles v. Claywell,* 736 S.W.2d 328, 331 (Ky.1987); *Nehring v. LaCounte,* 219 Mont. 462, 712 P.2d 1329, 1334 (1986); *Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269, 1273 (1982); *Brigance v. Velvet Dove Restaurant, Inc.,* 725 P.2d 300, 304 (Okla.1986); *Walz v. Hudson,* 327 N.W.2d 120, 124 (S.D.1982) (Wollman, J., concurring).

the situation more dire.[28]  *See Shannon,* 947 S.W.2d at 352 ("Today, motor-vehicle crashes are the single greatest health hazard to people under the age of 45."). In 2011, nationwide, a person was killed in an alcohol-related accident every fifty-three minutes. *See* Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2011 Data: Alcohol–Impaired Driving* 1 (2012). It should go without saying that this carnage created by automobiles and drunk drivers did not exist in the horse-and-buggy days.[29]

Likewise, our societal perceptions of drunk driving have changed greatly since our *Hatfield* decision in 1951, and even our *Felder* decision in 1981. The peak of the temperance movement in America was clearly Prohibition. But, after

---

**28.** As one court explained the negative effects that alcohol can have on the ability to drive: "we know by common knowledge that alcohol distorts perception, slows reaction, and impairs motor skills, while operation of an automobile requires clear perception, quick reaction, and adept motor skills." *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *see also Buchanan,* 463 So.2d at 126 ("Common experience dictates that when a person is imbibing alcoholic beverages that person reaches a level of toxicity after which continued imbibing will render him unable to operate an automobile safely.").

**29.** As one Court who questioned the usage in modern society of an old common law rule designed for the "horse and buggy" days explained:

The automobile is a constant reminder of a changed and changing America. It has made a tremendous impact on every segment of society, including the field of jurisprudence. In the "horse and buggy" days the common law may not have been significantly affected by the sale of liquor to an intoxicated person. The common law of nonliability was satisfactory. With today's car of steel and speed it becomes a lethal weapon in the hands of a drunken imbiber. The frequency of accidents involving drunk drivers are commonplace. Its affliction of bodily injury to an unsuspecting public is also of common knowledge. Under such circumstances we are compelled to widen the scope of the common law.

*Brigance,* 725 P.2d at 304; *see also Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200, 207 (1983) ("But the situation then and the problem in today's society of the imbiber going upon the public highways and operating a machine that requires quick response of mind and muscle and capable of producing mass death and destruction are vastly different.") (citation omitted); *Lopez,* 651 P.2d at 1273 ("A common law doctrine which developed in the horse and buggy days may be out of tune with today's society.").

Prohibition ended in 1933, "the pendulum would swing far in the other direction, strongly discouraging governmental intervention in the world of liquor." Barron H. Lerner, *One for the Road: Drunk Driving Since 1900* 4 (2011). As Lerner put it, the end of Prohibition "ushered in the acceptance of drinking, it also signified Americans' willingness to tolerate and even celebrate drunk driving, though this position was never quite stated as such." *Id.* at 14. Illustrating the prevalence of this societal acceptance at the time *Hatfield* was decided, some have argued that it would be "reasonable to call the 1950s and early 1960s the 'golden age of drunk driving.'" *Id.* at 38. With the prosperous economy following the end of World War II, Americans began to buy a large number of cars with just over 40 million vehicles on the road in 1950, the Eisenhower administration greatly expanded the country's interstate system, and baby-boom families began moving to the suburbs and taking more vacations. *Id.* at 44.

Unfortunately, in 1951, we did not have an understanding of how dangerous the roads were becoming with this increased automobile travel and Americans' continued desire to drink alcohol. The first attempt to study drinking and driving was not done until 1959, the first truly comprehensive study of drinking and driving was not done until 1968, the legal limit for a person's blood alcohol content ("BAC") to drive in 1951 was still 0.15%, and the breathalyzer was not invented until 1954. *Id.* at 49, 51, 54, 56, 61. Combining our renewed ability to drink alcohol following the end of Prohibition, with our embrace of the automobile following World War II, and our lack of understanding of how dangerous drinking and driving could be, the "societal acceptance of drunk driving persisted for nearly five decades, until . . . the late 1970s." *Id.* at 14.

This social acceptance began to change in 1980 when Mothers Against Drunk Drivers was initially created. *Id.* at 65. At the time we issued our *Felder* decision in 1981, however, the movement against drinking and driving had not yet fully taken off. It was not until 1982 when President Reagan condemned the "slaughter" caused by drunk drivers and appointed a presidential commission to study the subject. *Id.* It

was also after *Felder* that the drinking age was raised to 21 years old, the legal BAC limit to drive was lowered from 0.15% to 0.08%, portable breathalyzer testing began to be implemented, random sobriety checkpoints began to be used, and the concept of the designated driver and slogans such as "friends don't let friends drive drunk" became popularized. *See generally id.*

In sum, our society and the acceptance of drinking and driving has changed drastically since the 1800s when the common law rule was created, since 1951 when we first recognized the common law rule in Maryland, and since 1981 the last time we addressed the issue.

### Change in the Law

Tort law generally has dramatically evolved from the nine-teenth century to the present. Although concepts of fault have long existed, "negligence took shape as a separate tort only during the earlier part of the nineteenth century." Kee-ton, § 28, at 160. In its beginning, the tort was restricted to "the liability of those who professed to be competent in certain 'public' callings. A carrier, an innkeeper, a blacksmith, or a surgeon, was regarded as holding oneself out to the public as one in whom confidence might be reposed, and hence ... he might be liable."[30] *Id.* at 161. Negligence has evolved pro-foundly from this nineteenth century origin. For example, when the traditional common law rule was created, it was unheard of to hold a vendor liable for damages suffered by a subsequent consumer who lacked privity of contract. *See* Keeton, § 96, at 681 ("[T]he nineteenth century had firmly established the general rule that the original seller of goods was not liable for damages caused by their defects to anyone except his immediate buyer, or one in privity with him.") Yet, today, it is well accepted that vendors can be held liable to

---

**30.** The expansion of negligence beyond these " 'public' callings" "coin-cided in a marked degree with the Industrial Revolution; and it very probably was stimulated by the rapid increase in the number of acci-dents caused by industrial machinery, and in particular by the inven-tion of railways." Keeton, § 28, at 161.

third parties[31]—so much so that proof of negligence is not even required in strict products liability cases. *See, e.g., Phipps v. Gen. Motors Corp.*, 278 Md. 337, 340–41, 344, 363 A.2d 955, 957, 958 (1976).[32]

The most telling change of all, though, is the across-the-board retreat by state courts from the traditional common law rule, under which the serving of alcohol could not be the proximate cause of injuries suffered by a third person as a result of the tortious conduct of an intoxicated patron. Specifically, courts in thirty-four states have abandoned this common law rule and held that, as a matter of state common law, the serving of alcohol can be the proximate cause of such injuries. *See Buchanan v. Merger Enters., Inc.*, 463 So.2d 121, 126 (Ala.1984); *Nazareno v. Urie*, 638 P.2d 671, 673–74 (Alaska 1981); *Ontiveros v. Borak*, 136 Ariz. 500, 667 P.2d 200, 205–07 (1983); *Shannon v. Wilson*, 329 Ark. 143, 947 S.W.2d 349, 356 (1997); *Vesely v. Sager*, 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151, 158–59 (1971); *Largo Corp. v. Crespin*, 727 P.2d 1098, 1103–04 (Colo.1986); *Craig v. Driscoll*, 262 Conn. 312, 813 A.2d 1003, 1017 (2003); *Sutter v. Hutchings*, 254 Ga. 194, 327 S.E.2d 716, 719 (1985); *Ono v. Applegate*, 62 Haw. 131, 612 P.2d 533, 537–38, 540–41 (1980); *Alegria v. Payonk*, 101 Idaho 617, 619 P.2d 135, 139 (1980); *Elder v. Fisher*, 247

---

**31.** Judge Cardozo's storied opinion in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916) is largely given credit for expanding the reach of negligence to hold a manufacturer of a dangerous product liable to the ultimate user of the product. *See* Kenton, § 96, at 682–83. Maryland has recognized the importance of this opinion. *See, e.g., Volkswagen of Am., Inc. v. Young*, 272 Md. 201, 215, 321 A.2d 737, 744 (1974) ("Since the time of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), it has been generally held that an automobile manufacturer or supplier, like the manufacturer or supplier of other products, is liable in negligence to an ultimate user of the vehicle for a construction defect of which he was or reasonably should have been aware, which was not obvious to the user, and which causes a collision and resulting injuries.").

**32.** For examples of cases that also discussed this legal development of negligence, from its beginnings in the 1800s to modern society, when recognizing a cause of action for dram shop liability, see *Buchanan*, 463 So.2d at 125–26; *Shannon*, 947 S.W.2d at 352.

Ind. 598, 217 N.E.2d 847, 852–53 (1966); *Lewis v. State,* 256 N.W.2d 181, 191–92 (Iowa 1977); *Grayson Fraternal Order of Eagles v. Claywell,* 736 S.W.2d 328, 332–34 (Ky.1987); *Klingerman v. SOL Corp. of Maine,* 505 A.2d 474, 477–78 (Me. 1986); *Adamian v. Three Sons, Inc.,* 353 Mass. 498, 233 N.E.2d 18, 20 (1968); *Trail v. Christian,* 298 Minn. 101, 213 N.W.2d 618, 623–24 (1973); *Munford, Inc. v. Peterson,* 368 So.2d 213, 218 (Miss.1979); *Nehring v. LaCounte,* 219 Mont. 462, 712 P.2d 1329, 1335 (1986); *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1, 9 (1959); *Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269, 1275–76 (1982); *Berkeley v. Park,* 47 Misc.2d 381, 262 N.Y.S.2d 290, 293 (N.Y.Sup.Ct.1965); *Hutchens v. Hankins,* 63 N.C.App. 1, 303 S.E.2d 584, 591 (1983); *Mason v. Roberts,* 33 Ohio St.2d 29, 294 N.E.2d 884, 887–88 (1973); *Brigance v. Velvet Dove Restaurant, Inc.,* 725 P.2d 300, 304 (Okla.1986); *Campbell v. Carpenter,* 279 Or. 237, 566 P.2d 893, 897 (1977); *Jardine v. Upper Darby Lodge,* 413 Pa. 626, 198 A.2d 550, 553 (1964); *Harrison v. Berkley,* 32 S.C.L. (1 Strob.) 525, 550–51 (S.C.App.L.1847); *Mitchell v. Ketner,* 54 Tenn. App. 656, 393 S.W.2d 755, 759 (1964); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313–14 (Tex.1987); *Mackay v. 7–Eleven Sales Corp.,* 995 P.2d 1233, 1236 (Utah 2000); *Estate of Kelley v. Moguls, Inc.,* 160 Vt. 531, 632 A.2d 360, 363 (1993); *Sorensen v. Jarvis,* 119 Wis.2d 627, 350 N.W.2d 108, 118 (1984); *McClellan v. Tottenhoff,* 666 P.2d 408, 414–15 (Wyo.1983).[33]

Such a broad and resounding rejection of the old common law rule should not be ignored.  In 1981, in *Felder,* we recognized that there was a "new trend of cases" which had done away with the old rule and recognized dram shop liabili-

---

**33.** Another seven states, though not expressly discussing and rejecting the old common law rule of proximate causation, have implicitly done so by their recognition of a cause of action for dram shop liability.  *See Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1276 (D.C.1987); *Davis v. Shiappacossee,* 155 So.2d 365, 367 (Fla.1963); *Thrasher v. Leggett,* 373 So.2d 494, 497 (La.1979); *Sampson v. W.F. Enters., Inc.,* 611 S.W.2d 333, 335–37 (Mo.Ct.App.1980); *Walz,* 327 N.W.2d at 123); *Callan v. O'Neil,* 20 Wash.App. 32, 578 P.2d 890, 893 (1978); *Bailey v. Black,* 183 W.Va. 74, 394 S.E.2d 58, 60–61 (1990). This brings the total to forty-one states.

ty. 292 Md. at 178, 438 A.2d at 496. At that point, the Court urged the legislature to reconsider the issue, but chose, "for now," not to act on its own. *Id.* at 185, 177 A.2d at 500. With thirty-four state courts now agreeing, the cases are well past a "trend"—revealing a consensus that the old rule is no longer suitable for modern life. *See, e.g., Claywell,* 736 S.W.2d at 332 ("Thus, when we review the cases around the country deciding the issue of common law dram shop liability, the legal battle is largely over.").

### *Serving of Alcohol Can Be A Proximate Cause*

Changes in society and the law call for reevaluation of the old rule. To do this, we need not do anything extraordinary; we should simply apply our well-established principles of common law negligence and proximate causation.

It is a basic tenet of Maryland law that "[n]egligence is not actionable unless it is a proximate cause of the harm alleged." *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 337, 624 A.2d 496, 500 (1993). "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Pittway Corp. v. Collins,* 409 Md. 218, 243, 973 A.2d 771, 786 (2009) (quoting *Hartford Ins. Co.,* 335 Md. at 156–57, 642 A.2d at 230). I will take each in turn, but before I do, I want to stress the importance of the well-settled rule that "proximate cause—both cause-in-fact and legal cause—analysis is reserved for the trier of fact." *Id.* at 253, 973 A.2d at 792. In this action, the circuit court granted a motion for summary judgment. This is a question of law for the courts only when the facts are "susceptible of but one inference" and "where reasoning minds cannot differ." *Id.*

### *Cause–in–Fact*

The first step in proximate cause analysis is to determine whether the bar's negligence could have been a cause-in-fact of the Warrs' injuries. Cause-in-fact is the legal title given to "the threshold inquiry of whether defendant's conduct actually produced an injury." *Id.* at 244, 973 A.2d at 786 (citation and quotation marks omitted). To answer this question, two dif-

ferent tests have developed within Maryland law—the "but for" test and the "substantial factor" test. "The 'but for' test applies in cases where only one negligent act is at issue." *Id.* The "substantial factor" test applies in cases where "two or more independent negligent acts bring about an injury." *Id.,* 973 A.2d at 787. As this case involves two negligent acts— that of the bar and that of Eaton—the substantial factor test applies.

In *Eagle–Picher Industries, Inc. v. Balbos,* 326 Md. 179, 208–09, 604 A.2d 445, 459 (1992), we adopted the substantial factor test from the Second Restatement of Torts, which provides:

> The actor's negligent conduct is a legal cause of harm to another if
>
> (a) his conduct is a substantial factor in bringing about the harm, and
>
> (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

Restatement (Second) of Torts § 431 (1965). To aid in determining what conduct will satisfy this substantial factor test, the Restatement further states:

> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>
> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Restatement (Second) of Torts § 433 (1965); *see also Pittway,* 409 Md. at 244–45, 973 A.2d at 787.

The facts alleged in the Warrs' complaint and those relied on by the Circuit Court in granting the Defendant's Motion for Summary Judgement showed that Eaton became visibly intoxicated by the bar's conduct of over-serving him, including service after Eaton was visibly intoxicated and had become violent and aggressive. Assuming these facts, a jury could reasonably determine that the bar's conduct, in continuing to serve Eaton beyond the point of visible intoxication, created a dangerous force that was in continuous operation from the point at which the bar over-served Eaton to the point at which Eaton injured the Warrs. *See* Restatement (Second) of Torts § 433. If a jury found these facts, it could reasonably conclude that "it is 'more likely than not' that the [bar's] conduct was a substantial factor in producing the [Warrs'] injuries." *Pittway,* 409 Md. at 244, 973 A.2d at 787. With these allegations, it was improper to grant the motion for summary judgment, and thus remove this question from the province of the jury. Therefore, I would hold that the bar's service of alcohol to Eaton after he was "visibly under the influence" can be a cause-in-fact of the Warrs' injuries.

### Legal Cause and Intervening Acts

Once cause-in-fact is established, the proximate cause analysis turns to the question of whether the bar's negligence was a legally cognizable cause of the Warrs' injury. *See Pittway,* 409 Md. at 245, 973 A.2d at 787. The concept of legal cause "is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established." *Id.* (footnote omitted). Here, we "consider whether the actual harm to [the Warrs] falls within a general field of danger that the [bar] should have anticipated or expected." *Id.* In other words, "whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 246, 973 A.2d at 788. Legal causation does not lie where the court in retrospect believes that the injuries suffered by the plaintiff were "highly extraordinary and unforeseeable." *Id.* at 247, 973 A.2d at 788.

When there are consecutive or concurrent negligent acts that are causes-in-fact of the plaintiff's injuries, the foreseeability analysis must go one step further and consider intervening and superseding causes. "An intervening cause is one which comes into active operation in producing the result *after* the negligence of the defendant. 'Intervening' is used in a time sense; it refers to later events." Keeton, § 44, at 301. Though a subsequent act may be an intervening cause, "[l]iability is avoided only if the intervening negligent act or omission at issue is considered a superseding cause of the harm to the plaintiffs." *Pittway,* 409 Md. at 248, 973 A.2d at 789.

In determining whether an intervening cause rises to the level of a superseding cause, this Court has explained that "a superseding cause arises primarily when 'unusual' and 'extraordinary' independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." *Id.* at 249, 973 A.2d at 789. In other words, "[a]n intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence." *Sindler v. Litman,* 166 Md.App. 90, 115, 887 A.2d 97, 111 (2005).

In this regard, we have long held that "the defendant is liable where the intervening causes, acts, or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act." *Penn. Steel Co. v. Wilkinson,* 107 Md. 574, 581, 69 A. 412, 414 (1908) (citation and quotation marks omitted). In other words, "if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss." *Little v. Woodall,* 244 Md. 620, 626, 224 A.2d 852, 855 (1966).

To be sure, Eaton's drunken driving could be considered an intervening cause of the Warrs' injures as it came after the negligence of the bar, but it was not a superseding cause. As I explained under the duty-of-care analysis, it is clearly foreseeable by the bar, after continuing to serve a patron who is already "visibly under the influence" of alcohol, that the

patron may drink and drive, violate the rules of the road, and cause an accident. And, with commercial vendors being the single largest facilitators of drunk drivers, there is nothing about the facts of this case that, in retrospect, appear to be "highly extraordinary" or "unusual." The intervening negligent acts of Eaton could be found to be clearly foreseeable by the bar.[34]

Furthermore, the intervening acts of Eaton were set in motion by the earlier negligent conduct of the bar. According to the Complaint, the bar served Eaton for six hours, well past the point of visible intoxication. These alleged facts, if accepted by the jury, allow the reasonable conclusion that the bar increased the risk of damage to the Warrs through the foreseeable acts of Eaton. This question belongs to the province of the jury.

### Conclusion: Proximate Cause Exists

Applying our well-established common law principles of negligence, I would hold that the bar's alleged service of alcohol to Eaton after he was "visibly under the influence" can be a proximate cause of the Warrs' injuries. The continued service of alcohol after the point of visible intoxication can be a substantial factor in producing the foreseeable injuries suffered by the Warrs. Certainly, this Court cannot say, as a matter of law, that there can never be a causal relationship between the continued service of alcohol to a patron already "visibly under the influence" and the subsequent accident

---

**34.** "Common sense, common experience and authority all combine to produce the irrefutable conclusion that furnishing alcohol, consumption of alcohol and subsequent driving of a vehicle which is then involved in an accident are all foreseeable, ordinary links in the chain of causation leading from the sale to the injury." *Ontiveros,* 667 P.2d at 207; *see also Nehring,* 712 P.2d at 1335 ("[C]onsumption of the alcoholic beverages served, subsequent driving, and the likelihood of an injury-producing accident are foreseeable intervening acts which do not relieve the tavern operator of liability for negligence"); *Vesely v. Sager,* 5 Cal.3d 153, 95 Cal.Rptr. 623, 486 P.2d 151, 159 (1971) ("If such furnishing is a proximate cause, it is so because the consumption, resulting intoxication, and injury-producing conduct are foreseeable intervening causes . . . .").

**250**

which that patron causes upon leaving the bar. *See Ontiveros,* 667 P.2d at 205. As one of our sister courts put it, "if courts cling steadfastly to the myth that the continued selling of alcohol to a visibly intoxicated patron cannot be the proximate cause of a third person's injuries, they are wearing blinders when it comes to observing the ordinary course of events." *Buchanan,* 463 So.2d at 126.

I would overrule our prior decision in *Hatfield,* which followed outdated cases from the late 1800s, and its progeny, *Felder.* In doing so, I would enter the door that *Felder* left open, when it clearly recognized both this Court's authority to change our outdated dram shop rule, and the benefits of doing so.[35] Chief Judge Robert Murphy wrote for the Court,

> Of course, the common law is not static. Its life and heart is its dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems like that presented by the senseless carnage occurring on our highways, due in no small measure to the drinking driver. The common law is, therefore, subject to modification by judicial decision in light of changing conditions or increased knowledge where this

---

**35.** I share the views of Judge Rita Davidson, who dissented from the majority holding, saying that

> In my view, it is common knowledge that the problems associated with drunk driving have presently reached massive proportions. Just and fair solutions additional to those presently existing are required if societal interests are to be protected and preserved. As the majority itself notes, in the 30 years since *Hatfield,* courts in a majority of other jurisdictions that have considered the problem "have departed from the early common law rule and have imposed civil liability, independent of statute, upon sellers of alcoholic beverages for damages caused by their intoxicated patrons." In light of changing conditions, I, like these other courts, am convinced that the common law rule has become unsound in the circumstances of modern life. I would hold that a cause of action exists against licensed vendors of intoxicating liquors for the tortious acts of minor or intoxicated patrons to whom they sell alcoholic beverages in violation of Maryland Code....

*Felder v. Butler,* 292 Md. 174, 186, 438 A.2d 494, 500-01 (1981) (Davidson, J., dissenting).

Court finds that it is a vestige of the past, no longer suitable to the circumstances of our people.

*Felder*, 292 Md. at 182, 438 A.2d at 499. To be sure, when Chief Judge Murphy made that statement thirty-two years ago, we did not exercise our authority to change the law, electing—"for now"—to defer the issue of dram shop liability to the legislature. In doing so, however, we recommended that the legislature reexamine the *Hatfield* rule. *See id.* at 184, 438 A.2d at 499.

Our contemplation at that time that the Legislature would act affirmatively on the problem has apparently been misplaced. Since our invitation to the Legislature in 1981, no bill reached the floor of either house of the General Assembly. Four bills were introduced, but none came out of committee. *See* H.B. 1000 (2012); H.B. 1120 (2011); S.B. 739 (2002); S.B. 527 (1987). The two most recent bills, for example, were never voted on by the House Judiciary Committee.

Such legislative inaction, as this Court has held on numerous occasions, is not evidence of this State's public policy or legislative intent. *See, e.g., City of Balt. Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 329, 910 A.2d 406, 424 (2006) (rejection of a bill may not be evidence of intent "because the General Assembly may well have concluded that the rejected amendment 'warrant[ed] further investigation' before acting on it or decided not to enact the amendment for a myriad of other reasons" (alteration in original) (citation omitted)).[36] I

---

**36.** *See also Goldstein v. State*, 339 Md. 563, 570, 664 A.2d 375, 378 (1995) ("[T]he mere fact that the General Assembly has declined to adopt a particular proposal does not preclude this Court from incorporating the substance of that proposal into the common law or our interpretation of a statute."); *Auto. Trade Ass'n of Md., Inc. v. Ins. Com'r*, 292 Md. 15, 24, 437 A.2d 199, 203 (1981) ("[T]he fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent."); *Cicoria v. State*, 89 Md.App. 403, 411 n. 9, 598 A.2d 771, 775 n. 9 (1991), *aff'd*, 332 Md. 21, 629 A.2d 742 (1993) ("Trying to determine what the legislature intended (or did not intend) by rejecting those bills is no easy assignment ... [and] 'the failure of a committee [of the legislature] to act favorably on a proposed bill should not be relied upon, in the absence of an indication as to the reason for the failure, to

suggest that this is especially true when, as here, a bill is kept in committee, as opposed to being voted against on the floor.[37]

## CONCLUSION

I aver that, with no legislative action on the issue in the thirty-two years since *Felder*, and an even larger trend of jurisdictions supporting liability, that the *Felder* Court's declining change "for now" should be amended to: **now** is the time for change. I strongly urge this Court to recognize that *Hatfield* and the nineteenth century cases it relied on wrongly "encumber the law of proximate causation with an artificial limitation that precludes jury consideration of the causal relationship between the sale of intoxicating beverages and consequent harm."[38] *Klingerman v. SOL Corp.*, 505 A.2d 474, 478 (Me.1986); *see also Crespin*, 727 P.2d at 1104. It is not our place to continue to preserve special protections for tavern owners, when applying our well-established common law principles of negligence would hold them liable.

---

ascertain legislative intent.' " (alteration in original) (citation omitted)); *Suessmann v. Lamone*, 383 Md. 697, 748, 862 A.2d 1, 31 (2004) (Bell, C.J. dissenting) ("Maryland law is clear, legislative silence on a particular subject is not evidence, one way or the other, of legislative intent as to that subject.").

37. In a committee, the power of a few—in combination with the concentrated lobbying of interest groups—has the power to kill a bill for any myriad of reasons. As the Arizona Supreme Court explained in recognizing dram shop liability after two bills had failed in a legislative committee:

There are many reasons why bills are not reported out of committee. For example: the bill may be opposed by a particular committee member or by the chairperson; efforts of special interest groups and lobbyists may be successful at the committee level; or a lack of time for consideration of the bill may prevent passage by the committee. *Ontiveros*, 667 P.2d at 212. The failure of the bills in this case to make it out of committee—especially when the committee does not even vote on the bill—is not reflective of the will of the people as a declaration of our public policy.

38. As one court explained, such reasoning is a "Neanderthal approach to causation." *Nehring*, 712 P.2d at 1335.

Yet, the Majority, in reaching its outcome, has done violence to the tort of negligence which will have far ranging consequences, well beyond the issue of dram shop liability. Our opinions must, first and foremost, be guided by sound legal reasoning, because seeking to obtain a particular result in one bad case can quickly make a lifetime's worth of bad law. I fear that, in reaching its desired holding today, the Majority's legal reasoning does just that. Respectfully, I dissent.

Judges HARRELL and McDONALD authorize me to state that they agree with the views set forth herein.